IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| USA | § | CASE NO. 4:24-CR-00543-1,5,6 |
| | § | HOUSTON, TX |
| VERSUS | § | |
| | § | |
| JOHN M PFEFFER, | § | MONDAY, |
| BRADLEY RICKENBACKER, | § | March 3, 2025 |
| DAVID VARGAS | § | 9:00 AM to 12:14 PM |

DETENTION HEARING

BEFORE THE HONORABLE RICHARD BENNETT
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PARTIES: SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: JARED BARRIOS

COURT CLERK: SHANNON JONES

TRANSCRIPTION SERVICE BY:

Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396 ▼ www.veritext.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For United States:
GRACE HAVARD BOWEN
KELLY ZENON-MATOS
BYRON HUGH BLACK
U.S. Department of Justice
U.S. Attorney's Office,
Southern District of Texas
1000 Louisiana Street, Suite 2300
Houston, TX 77002

For John Pfeffer:
QUENTIN TATE WILLIAMS
Hilder & Associates
819 Lovett Boulevard
Houston, TX 77006

For Bradley Rickenbacker:
MICHAEL DEGUERIN
Foreman DeGuerin & DeGuerin
300 Main St Suite 300,
Houston, TX 77002

For David Vargas:
JOHN WAKEFIELD
The Law Offices of John Wakefield
1210 W. Clay Street, Suite 12
Houston TX 77019

HOUSTON, TEXAS; MONDAY, MARCH 3, 2025; 9:00 AM

THE COURT CLERK: The United States District Court for the Southern District of Texas now in session, with the Honorable Richard W. Bennett presiding (indiscernible) these United States, and this Honorable Court.

THE COURT: Thank you. Be seated.

Good morning. This is United States Magistrate Judge Richard Bennett. You are here for the 9 a.m. docket, which is a continuation of the detention hearings in cause number 4:24-CR-00543, Defendant number 1, John Pfeffer, Defendant number 5, Bradley Rickenbacker, and Defendant number 6, David Vargas.

Will the parties to announce their appearances?

MS. BOWEN: Yes, Your Honor. Grace Bowen, on behalf of the Government.

THE COURT: Ms. Bowen.

MS. ZENON: Kelly Zenon, on behalf of the United States, Your Honor.

THE COURT: Good morning.

MR. BLACK: And Byron Black, for the Government.

THE COURT: All right. Good morning.

MR. WILLIAMS: Tate Williams, for Mr. Pfeffer.

THE COURT: Good morning.

MR. DEGUERIN: Michael DeGuerin, for Mr. Rickenbacker.

THE COURT: Good morning.

MR. WAKEFIELD: John Wakefield, for Mr. Vargas.

THE COURT: Good morning. And all the Defendants are present, and here.

All right. So last time, we took a break right before Defense started their cross, in order to exchange Jencks materials. So has that been done?

MS. BOWEN: Yes, Your Honor.

THE COURT: And have you all had enough time to review those materials, to go forward?

MR. WILLIAMS: Yes, Your Honor.

MR. DEGUERIN: Yes, Your Honor.

MR. WAKEFIELD: Yes, Your Honor.

THE COURT: All right. So then, will you please recall the witness?

MS. BOWEN: Yes, Your Honor. The Government calls Task Force Officer Joshua Lyons.

THE COURT: You can go ahead and put him back under oath.

THE COURT CLERK: Yes, Judge.

Please raise your right hand.

Do you swear that the testimony you will give the Court today will be the truth, the whole truth, and nothing but the truth, so help you God?

OFFICER LYONS: Yes, ma'am, I do.

THE COURT CLERK: You may be seated.

THE COURT: You may proceed.
MR. WILLIAMS: (indiscernible)
CONT'D CROSS-EXAMINATION
BY MR. WILLIAMS:
Q. Officer Lyons, have you reviewed the indictment in this case?
A. Yes, sir.
Q. And you agree that my client, Mr. Pfeffer, is not charged with any (indiscernible) act occurring by him in 2024 or 2025?
A. I'm just thinking about the indictments, Your Honor. I don't believe so, sir.
Q. And in fact, the two acts that are the substantive, of it counts 2 and 3 relates to a 2020 allegation that arises from the incident at The Hawg Stop bar. Right?
A. That's one of them, yes, sir.
Q. And the other relates to the February 2023 incident at the Bimbo's bar?
A. Yes, sir.
Q. And so he's not charged with any substantive crime more recent than February of 2023. Correct?
A. At this time.
Q. You would agree with me that it's not a crime to be a Bandito, generally. Is it?
A. To specifically be a member, no, sir.

Q. A member can commit a crime, but it's not a crime to be a member.

A. It is not a crime to be a member of the Banditos.

Q. And they're not a secret organization, are they?

A. No, sir.

Q. In fact, I believe during the trial of Jeffrey Pike in 2017, they were in fact incorporated as a 501(c) non-profit under the laws of the United States. Is that correct?

A. I believe so.

Q. And they wear their vests, which you call cuts, proudly and openly.

A. Yes, sir.

Q. And the colors of the Bandidos, the red and gold, those are the same as the United States Marine Corps?

A. I'm a former Marine. We had them first.

Q. Probably by a couple hundred years. Right?

A. Yes, sir.

Q. Okay. And that's because the founder was a Marine Corps veteran officer. Right?

A. I believe he was, yes.

Q. Okay. And you're aware that Mr. Pfeffer is also a veteran?

A. I believe so, yes, sir.

Q. Now you refer to the Bandidos, and others as an outlaw motorcycle club, or outlaw motorcycle gang, or OMG. Is

that right?

A. Yes, sir.

Q. And that's a moniker I think that's been said about various motorcycle clubs, going back to a comment made by the head of the American Motorcycle Association, like in the late '40s, early '50s, somewhere around there. Correct?

A. I'm not sure the date of it. But yes, sir, a comment from him.

Q. After the Hollister riots.

A. Yes, sir.

Q. Okay. And the gist of that is that I believe the head of the AMA said that 99% of motorcycle owners in America are honest, law-abiding citizens. Right?

A. Yes, sir.

Q. And so the 1% is the implication that there's 1% that aren't. Right?

A. Yes, sir.

Q. And people that hold themselves out as 1% wear that as a symbol of pride, in your opinion?

A. As outlaws, yes, sir.

Q. Okay. And that's an old tradition in motorcycle culture, going back prior to even the formation of the Bandidos. Correct?

A. For those that fly the 1% diamond on their cuts.

Q. Yes, sir. Now, you've also heard some say that

the 1% means that only 1% have heart and dedication?
A. No, sir.
Q. And you also say that just because someone wears a symbol for something, for example a 1%, or a cross, or something else, doesn't necessarily mean that they're true to whatever the symbol they wear is. Correct?
A. I don't believe that.
Q. So you think if somebody, just because somebody wears a symbol, that they're -- that that's who they actually are?
A. In the Banditos, you have to earn that 1%.
Q. I mean in general, sir.
A. I'm not here to speak in general. I'm here to speak about the Banditos.
Q. Okay. Well, you're aware of fighter squadrons in the U.S. Navy and Marine Corps that wear a Jolly Roger on their tails of their planes. It doesn't mean they're pirates, does it?
A. Some people affiliate the Jolly Roger with pirates, some don't.
Q. And we already said that everybody that's a Bandito is not necessarily a criminal, or a crime to be a member of the Banditos. Correct?
A. It's not necessarily that you're a criminal.
Q. And everybody who wears religious jewelry doesn't

necessarily follow the tenets of their religion 100% of the time. Correct?

A. They claim to be that. Whether they follow it or not is a personal decision.

Q. And you're aware that Mr. Pfeffer, and other Banditos have done charitable things over the years, like they have toy drives at Christmas. Right?

A. They've had toy drives, yes, sir.

Q. And I believe one of the Government's exhibits that you looked at was the bylaws or application to be a member of the Bandidos. Correct?

A. Yes, sir, I believe they're submitted into evidence.

Q. There's nothing in any of those that makes a promise to commit a crime, is there?

A. A promise?

Q. Yes, sir.

A. To commit a crime, that verbiage isn't used, no, sir.

Q. In fact, they have to agree not to use hard drugs. Correct?

A. No, sir, that's not in there at all. Just no needle use. You can snort cocaine.

Q. Well, but there's no mention of cocaine in the bylaws. Correct?

A. I think that's funny that it's not.

Q. Okay. Well, regardless of whether you think it's funny or not, there's no promise to -- There's nothing criminal expressly mentioned in the bylaws.

A. Specifically according to the narcotics, if all you're going to do is specify no needle use?

MR. WILLIAMS: Which Government exhibit is that? May I see the Government exhibits, please?

BY MR. WILLIAMS:

Q. I'm going to show you what's marked Government Exhibit number 7. It's the Bandidos Motorcycle Club prospective member application. Correct?

A. Yes, sir.

Q. All right. Will you please identify for me on the application, and the -- Well, somebody, they have to fill that out. Right?

A. Yes, sir.

Q. Okay. And when someone fills that out, they have to give their personal information, their address, their phone number, stuff like that. Correct?

A. It's sent in to Mr. Morian, in the courtroom, for background.

Q. Okay. Sorry you didn't understand my question.

A. I understood it.

Q. They have to fill out their personal information.

Right?

A. Yes, sir.

Q. Okay. Then they have to review the bylaws, and sign them, agreeing to them. Right?

A. Yes, sir.

Q. Would you please identify for me on page 1 where someone who fills this out expressly agrees to commit a crime? Is there anything like that on page 1?

A. I'm going to need a few seconds to read it, sir.

Q. Take your time.

A. Like I said, the don'ts don't forbid a zero tolerance to narcotics.

Q. Okay. I'm sorry you didn't understand my question. Is there something on page 1 where somebody says they're going to agree to commit a crime?

A. You're not agreeing not to use narcotics.

Q. That's on page 1?

A. That's my interpretation of the rule.

MR. WILLIAMS: I object to the non-responsive.

BY MR. WILLIAMS:

Q. I'd like for you to please listen to the questions that I'm asking, not the questions you wish I'd ask. So, is there something on page 1 of this that says that I'm going to commit a crime on behalf of Banditos?

A. Those words are not on here.

Q. Okay. Is it on page 2?
A. The words "crime" aren't on here, no, sir.
Q. They're not anywhere on there, are they?
A. I haven't got to page 3 yet.
Q. By all means, finish reviewing the document. You've seen these before, haven't you sir?
A. Yes, sir.
Q. In fact, you obtained these during a search of -- Well, without saying how you obtained them, you obtained these. Correct?
A. Numerous copies, sir.
Q. Okay. And you've reviewed these before. Right?
A. Yes, sir.
Q. All right.
A. The word "crime" isn't on page 3.
Q. Is it on any other page?
A. Just those three pages, sir.
Q. Okay. What about page -- okay. So you've reviewed the document. In fact, the word "crime -- " There's no agreement to commit a crime expressly anywhere in this document. Correct?
A. On the three pages, no, sir.
Q. Okay. Well, how many pages are there?
A. Well, I was just counting the bylaws.
Q. Okay. Well, let's walk through the bylaws. So

let's talk about requirements for a chapter. Five member minimum, ten years charter member, keep information and pictures. Right? Hold weekly meetings, and pay dues. That's paragraph 1. Right?
A. In summary, yes, sir.
Q. No crime there. Correct?
A. No, sir.
Q. Two refers to patches. It says only a top and a bottom rocker, the Fat Mexican, a 1% diamond, an MC patch should be on the back of your cut, and it should be visible for 150 feet. Is that what it says?
A. Yes, sir.
Q. A 1% diamond will be worn over the heart. Right?
A. Yes.
Q. Okay. So this means everybody who becomes a Bandito wears a 1%. Right?
A. Yes, sir, after you've earned it.
Q. Well, after you become a Bandito.
A. A full member, yes, sir.
Q. Right. So every full member wears one. Right?
A. A 1%, yes, sir.
Q. And it says anything else is up to the individual member.
A. Patches to wear, yes -- well, yes, sir.
Q. Okay. So this doesn't say you have to earn, and

you will be given and requirement to other patches. It says other things are up to the member. Right? That's what this says.

A. I'm sorry, could you repeat the question?

Q. It says anything else is up to the individual member.

A. To wear on your cut?

Q. Yes.

A. Yes, sir. Someone else doesn't dictate to them what else to wear.

A. No, sir. It's not dictated, no, sir.

Q. Okay. So there's nothing in paragraph 2 on patches that's criminal. Right?

A. There are -- there are patches that mean criminal, but it doesn't say that.

Q. That's your interpretation. But in these bylaws, sir, there's nothing in number 2 that says anything about committing a crime.

A. I know. I just said there's nothing criminal that says it.

Q. In paragraph 3, about dues, there's nothing in here criminal either. Is there?

THE COURT: All right. We've already gone over this. Crime is not mentioned in the three pages. I got that.

OFFICER LYONS: (indiscernible)

BY MR. WILLIAMS:

Q. Well, in paragraph 4, it says you don't lie. Correct?

A. Yes, sir.

Q. It says you don't steal. Right?

A. Yes, sir.

Q. And that's saying don't commit a crime, because stealing is a crime. Right?

A. It's steal from your brothers. It's not crime.

Q. Well, it doesn't say anything about brothers in paragraph 4, does it?

A. It's funny how they left that out.

MR. WILLIAMS: Objection to non-responsive.

BY MR. WILLIAMS:

Q. In fact, the last bullet point says, "Neither will smoking of any chemical, coke, speed, or mandrax. If it didn't grow, don't smoke it." Correct?

A. You just inhale it.

Q. Is that what it says, or not?

A. It doesn't say not to.

Q. I'm sorry, but was my reading of the last bullet point correct or not, sir?

A. Your reading of it was correct.

Q. The text is correct?

A. Your reading of the text was correct.

Q. Okay. You mentioned earlier that the Banditos actually run background checks on their members. Right?
A. Yes, sir.
Q. Now, I'd like to turn your attention to The Hawg Stop fight.
A. Would you like this back, sir?
Q. Yes, sir. It's the Government's exhibit.
The Hawg Stop fight was four-and-a-half years ago, on September 26th, of 2020. Right?
A. Roundabout.
Q. Roundabout? It was a day or two off, or --
A. I don't know whether it's exactly four-and-a-half, sir. That's what roundabout meant.
Q. Okay. So it was September 26th, of 2020?
A. Yes, sir.
Q. Okay. So that's -- that would be from September 26th of -- September 26th of '24 would be four years. Right?
A. Yes, sir.
Q. Okay. So three months would take us to December. Right? And then two to February, so about a little more than four years and five months. Is that correct?
A. Sounds right.
Q. And until now, John Pfeffer has never been charged with a crime related to anything that happened at The Hawg Stop. Correct?

A. Regarding The Hawg Stop charge, no, sir.
Q. In fact, the only person that was charged with a crime is Roy Gomez.
A. Yes, sir.
Q. And he's charged with murder, and he's awaiting trial in State Court. Correct?
A. Yes, sir.
Q. And you agree that at The Hawg Stop, my client was shot twice?
A. I don't know about how many times. I know he was shot.
Q. Well, you got a -- Didn't you get a subpoena to get his medical records for Memorial Hermann?
A. I did not.
Q. Okay. Well, you're aware of them. They were in your file, weren't they?
A. Yes, sir.
Q. Did you review his medical records?
A. Not all of them. I saw he had a gunshot wound.
Q. All right. So he was a crime victim in that incident?
A. I don't consider him a victim.
Q. Did you determine who shot him?
A. No, sir.
Q. Are you familiar with a search warrant affidavit

that y'all produced, done by your partner, Mr. Koncir, Keith Koncir? Do you consider your partner, Mr. Koncir, to be reliable?

A. Yes, sir.

Q. Are you aware that on December 1st, 2020, he swore out an affidavit saying that, "It was determined that before being shot and killed, Burns discharged his own weapon, potentially to defend himself. Based on the investigation, I have reason to believe that at least two Banditos OMG members were shot during the incident (Lett and Pfeffer.) Are you familiar with that?

A. Familiar with what?

Q. That determination made by Mr. Koncir.

A. I believe that was in the warrant.

Q. Well, it's under oath. Right?

A. Yes, sir.

Q. Okay. So do you have any reason to dispute his determination that Burns shot Lett and Pfeffer?

A. It wasn't determined.

Q. Would you like to review his affidavit, sir?

A. I don't need to.

Q. Why not?

A. Because it says what you say it says.

Q. Okay. So he had, your -- Mr. Koncir, your co-agent on this investigation says he has reason to believe that

Lett and Pfeffer were shot. Correct?
A. They were shot, yes, sir.
Q. Okay. It was also, according to him, it was also determined that Burns discharged his weapon. Right?
A. That was his belief at the time.
Q. Do you disagree that Burns discharged his weapon?
A. I -- yes, because we could not determine it.
Q. And Burns was the individual who was killed at The Hawg Stop. Correct?
A. Yes, sir.
Q. And he was armed. Right?
A. We believe he was armed.
Q. And that was a crime, for him to carry a weapon to a bar in the state of Texas, under Texas law. Correct?
A. As it was for Mr. Pfeffer and Mr. Gomez.
Q. Sir, that's not the question. I asked you I asked you was it a crime for Mr. Burns to go armed to The Hawg Stop on September 26th, 2020.
A. I don't remember the distance of the feet that makes it illegal. I'd honestly need to look at the state law, whether it's inside, or 50 feet, parking lot. I'm not sure.
Q. But he was armed there. Right?
A. Yes, sir.
Q. Okay. And my client was shot. Correct?
A. Yes, sir.

Q. Now, when they went off to the side in that video that we watched, no one else was with them at first. Correct?

A. What side, sir?

Q. On the video that you were shown, where you say that John Pfeffer and Adam Burns went down to talk, okay, the bottom corner of the screen, there's no one else close to them at that point?

A. I don't know the distance. They're not right on top of them, no, sir. I think maybe within 10 feet or so.

Q. So no one else was -- no one else knows what was said between them?

A. To my knowledge, no, sir.

Q. And Burns was armed?

A. Yes, sir.

Q. And John Pfeffer was holding a drink.

A. Yes, sir.

Q. And he was still holding a drink when he punched Burns, according to that video. Correct?

A. He was, yes, sir.

Q. He didn't even spill his drink.

A. I can't -- I don't know if he spilled his drink or not.

Q. Well, he didn't set it down before he threw a punch, did he?

A. No, sir.

Q. In fact, he set it down afterwards. Right?
A. Yes, sir.
Q. So nobody knows what was said between them that would have caused Mr. Pfeffer to throw a punch at Mr. Burns. Correct?
A. I'm not sure why he punched him.
Q. Right, you're not sure. It could have been a threat coming from the Mr. Burns, who was armed. Correct?
A. Mr. Pfeffer was armed, too.
Q. You don't have any evidence that Mr. Pfeffer was armed.
A. Yes, sir, I do. It's in your discovery.
Q. Sir, there was no gun found on Mr. Pfeffer that night. Correct?
A. He left.
Q. That's right. And he went to the hospital. Correct?
A. Yes, sir.
Q. And when y'all went to pick up his stuff at the hospital, there were no weapons in his clothes and boots, etc.
A. I wouldn't think he'd have left his weapon out there in the open.
Q. That's not what I asked you, sir. Please listen to the question I'm asking you. When you recovered his property --

A. Well, I didn't go out there, so I didn't find (indiscernible)

Q. When the property was recovered, okay --

A. Actually, I think they did find a pistol magazine, yes, sir.

Q. Who?

A. The HPD officers that went out there.

Q. Out where, sir?

A. To the hospital.

Q. You think the HPD people found a pistol magazine?

A. I think, if I remember that in the discovery.

Q. You're not sure. Correct?

A. I believe that's what it says, if I could see the report.

Q. All right. Yeah.

THE COURT: And also, just stop talking over each other. Let him ask the question, and you answer it. Let him finish answering before you ask a question. Because we've got to take all this down.

BY MR. WILLIAMS:

Q. And he went to the hospital because he'd been shot.

A. Yes, sir.

Q. And he may have been shot by Mr. Burns.

A. May have.

Q. And Mr. Pfeffer was not charged with a crime, not even a Class A misdemeanor assault for what happened that night, prior to this indictment. Correct?

A. No, sir.

Q. And Pfeffer was not a chapter president at that point in time either, was he?

A. At that time, no, sir.

Q. Now, the next incident that you mentioned involving Pfeffer is two-and-a-half years after that, or roughly, let's say a February of 2023 fight at Bimbo's. Right?

A. Just in the indictment of what he's indicted for --

Q. Yes, sir, in this indictment.

A. Yes, sir. Yes.

Q. So that's about two years and five months later. Correct?

A. Yes, sir.

Q. Now, Bimbo's is a bar. I guess we could agree that it's up in the northwest part of the county, off 249, Spring Cypress somewhere?

A. I believe so, yes, sir.

Q. And that was, again, about two years ago?

A. Yes, sir.

Q. And we don't have any video -- or excuse me, you were not able to obtain any video or pictures from the incident

at Bimbo's of John Pfeffer hitting anyone. Correct?
A. Just the victim statement.
Q. A victim statement?
A. Yes, sir.
Q. And who was the victim that says John Pfeffer hit them?
A. You want his name?
Q. Mm-hmm.
A. He is a Grey Beards member by the name of Phillip Alspaugh.
Q. Oswald?
A. Alspaugh.
Q. And how do you spell that?
A. A-L-S-P-A-U-G-H.
Q. Okay. So we have a rival club, or let's say an antagonistic club at least at this point in time, member saying that John Pfeffer hit them. Correct?
A. They're not a rival, or antagonistic.
Q. Well, as of, according to your testimony, that night, there was some kind of beat up or brawl between the two clubs. Correct?
A. They were jumped.
Q. Well, you say jumped. But there was a physical altercation between two clubs. Correct?
A. They were jumped. They were assaulted.

Q. Is that a physical, when you say physical -- jumped, that means a physical altercation. Right?
A. Can I explain? By definition --
Q. No, you can't.
A. (indiscernible) your question.
MR. WILLIAMS: Objection to non-responsive.
BY MR. WILLIAMS:
A. What's your question?
A. Sir, the question is when you say jumped, you mean a physical fight, but you're implying who started it. Correct?
A. I know who started it.
Q. Were you there?
A. No, sir.
Q. Okay. And we don't have video of it happening either, do we?
A. It shows the assault on the video.
Q. The video we saw shows the assault?
A. It shows an assault in progress over on the side.
Q. If it's in progress, that means something's already started. Correct?
A. Well, yes, sir. It had --
Q. So you have to rely on other people to tell you who started it. Correct?
A. We don't have a reason not to believe the victim.

Q. So is that a yes?
A. To rely on the victim statement, yes.
Q. To rely on other people's statements about who started it. Correct?
A. The victim, yes, sir.
Q. Okay. Who you call a victim. Correct?
A. He was robbed, yeah.
Q. Okay. And -- but we don't have John Pfeffer initiating the assault on video, do we?
A. Him initiating it on video? No, sir.
Q. Okay. And in fact, the Bandito, the senior-most Bandito at the scene of the Bimbo's assault in February of 2023 was Mike Dunphy.
A. Him, excuse me, him and another national sergeant at arms.
Q. Okay. So Mike Dunphy was a national sergeant at arms.
A. Yes, sir.
Q. And I believe at that point in time, he, and there was another individual that were co-sergeants, or one was an assistant sergeant, or something to that effect. Correct?
A. Yes, sir. Yes, sir.
Q. And those are people that are designated by the national office to be over a certain region. Correct?
A. Yes, sir.

Q. And Mike Dunphy was, according to your investigation, was over this region at that point in time?
A. Yes, sir.
Q. And so any decisions that were going to be made about what happened at that night would have been made by Dunphy, or his other sergeant at arms colleague. Correct?
A. That's not necessarily true.
Q. Well, you testified that at the end of that fight, we see Mr. Dunphy on video stick his finger in the air, and twirl it in a circle as a signal to leave. Correct?
A. Yes, sir.
Q. And that would indicate that he was in a position of authority. Right?
A. Yes, sir.
Q. And in fact, at his hearing, you testified that he was in charge that night because he could have stopped it, and did not.
A. Yes, sir.
Q. Okay. So he or his colleague sergeant at arms were the senior Banditos that night.
A. Yes, sir.
Q. And they didn't stop whatever was occurring?
A. No, sir.
Q. At least not until he did the twirling finger to leave. Right?

A. Yes, sir.

Q. Okay. Now, in addition to those two incidents, you were shown some videos of Mr. Pfeffer rapping or singing, or something like that. Correct?

A. Oh, yes, sir.

Q. And he believed he appears to be jolly, and having a good time in those?

A. Yes, sir.

Q. He appears to be joking around.

A. I guess it was one of those selfie, funny, send to your buddies kind of thing.

Q. Yeah. So something funny, send it around, maybe humor or satire, not to be taken seriously. Right?

A. Well, we take gang members saying they're going to do gang stuff, pointing weapons seriously.

Q. Well, let's talk about the weapon. He had a short barrel -- he had a shotgun with a shorter barrel in one of those videos. Right?

A. Yes, sir.

Q. And you're familiar with tactical shotguns. Correct?

A. Yes, sir.

Q. And tactical shotguns are shotguns that have a legal shorter barrel, that extends a few inches beyond the magazine underneath. Right?

A. Yes, sir.

Q. And they can also have pistol grip. Correct?

A. Yes, sir.

Q. And you can buy those at Academy, or any number of other sporting goods or gun stores. Correct?

A. Yes, sir.

Q. Nothing illegal about those?

A. No, sir.

Q. In fact, Mossberg, Benelli, other widely known manufacturers make those guns. Correct?

A. Yes, sir.

Q. And people use them for home defense, self-defense, other types of things?

A. Yes, sir.

Q. And you haven't recovered, in the various search warrants at Pfeffer's home, any sawed-off shotgun. Correct?

A. An illegal sawed-off, no, sir.

Q. All right.

A. Or I'm sorry, any sawed-off, a short barrel -- yeah.

Q. And in fact, you've never recovered any illegal firearm in his homes. Correct?

A. Illegal, no, sir.

Q. Okay. So that gun that's in that video, it's just as likely that it's a perfectly legal -- But you have

recovered shotguns at his house. Correct?
A. Yes.
Q. Including a Mossberg shotgun.
A. Yes, sir.
Q. So there's no evidence that that's actually an illegal firearm. Correct?
A. No, sir.
Q. Okay. Now, with respect to those search warrants, y'all ran a search warrant in his house, and that's the house he has on Cayman Point Drive, in Kelliwood Terrace, in Katy. Right?
A. Yes, sir.
Q. And that's a suburban neighborhood. Right?
A. Yes, sir.
Q. It's not a trailer park, it's not the ghetto or anything like that. It's a middle class area. Correct?
A. Yes, sir.
Q. Now, y'all ran a search warrant there on May 10th, last year, on 2024. Correct?
A. Yes, sir.
Q. Y'all did not recover any contraband during that search, did you?
A. Can you define contraband?
Q. Illegal drugs or illegal firearms.
A. No, sir. Instead, you all checked the firearms

to make sure they were stolen and they came back as not stolen. Right?
A. Yes, sir.
Q. And then you all returned, and left his guns in place. Is that correct?
A. Per that search warrant, we had no authority to take those firearms at that time.
Q. So you left his guns, Mr. John Pfeffer, that you claim is the chapter president of the Welcome to Hell chapter for the Bandidos Outlaw Motorcycle Gang, you went to his house, you found a bunch of guns, and you gave them back to him. Right?
A. We had no legal authority at the time to take them, sir.
Q. Right. Because what y'all were looking for at that time was evidence related to a Snapchat threat against the potential witness. Right?
A. Yes, sir.
Q. And we don't have the actual threat from said Snapchat, do we?
A. The threat was deleted. We just have one posting.
Q. So who actually saw the threat?
A. The victim.
Q. And I don't want you to say his name.

A. Yes, sir.

Q. I just want to verify that you didn't see the actual threat, did you?

A. On the Snapchat, no, sir.

Q. Okay. And no other agent saw it either. Right?

A. No, sir.

Q. And y'all have never been able to actually recover it from his phone, Snapchat, or from the Defendant's phone yet, have you?

A. No, sir.

Q. And y'all have tried. Right?

A. Yes, sir, still.

Q. Are those processes still ongoing?

A. I believe so.

Q. Okay. So -- but as far as we know, we have to rely on what this unknown -- well, let's just say unnamed, because out of respect, what he claims John Pfeffer wrote on Snapchat. Correct?

A. Yes, sir.

Q. And what he supposedly wrote was that he said, "They must have caught you with something big. Don't worry, we got your information from your old club. BFFB, right? Don't worry, we'll get you." Is that it?

A. Yes, sir.

Q. There's no actual threat of violence there.

Right?

A. We'll get you? That's pretty implied.

Q. Well, that could mean -- You have to interpret it. Correct?

A. That's a threat.

Q. Well, sir, that's not the question I asked you. That's your interpretation. Right?

A. We look for elements of an offense. And if it meets the elements of the offense, our interpretation is that that's a threat. That's --

Q. He hasn't been charged with witness tampering, has he?

A. I'm not sure if that's in the indictment.

Q. Has he been charged in State Court with witness tampering?

A. No, sir.

Q. Has he been charged with obstruction of justice?

A. In this case?

Q. At all, anywhere, ever.

A. He's been charged with obstruction and retaliation in the past.

Q. And that was dismissed for no probable cause in State Court in 2020. Correct?

A. I know it was dismissed. I'm not sure why.

Q. Yes. And in fact, the judge ordered that his

Bandito cut for this outlaw motorcycle gang was returned back to him as a condition of that. Right?

A. I'm not sure of that.

Q. All right. Well, I'd like to show you, then, what's been marked, and I believe you've looked at, Defense Exhibit -- I'll have to renumber some, but I'm going to call it Defense Exhibit 1. It's a two-page, front and back, document, with four pages. You see that? Is that a motion to dismiss against John Pfeffer for obstruction and retaliation?

A. It says motion to dismiss, motion to restore personal property.

Q. Okay. On the motion to dismiss, it says, in the box checked and the notation next to it says, "Judge found no probable cause." Correct?

A. It says, "Other explanation required." Oh yeah, I'm sorry, explanation underneath it, yeah (indiscernible)

Q. And it was signed by the judge, the case was dismissed in 2020. Right?

MS. BOWEN: Your Honor, I'm going to object that this is not relevant to the case at hand.

THE COURT: I believe it's relevant, given that you've moved to detain him based on obstruction.

BY MR. WILLIAMS:

Q. It was signed in -- That case was dismissed in 2020 by the judge, signed, with that date of that order being

signed. Correct?

A. Yes sir.

Q. Okay. Now, the next page of the document I believe is, if I can have it back, is the motion to restore property by Assistant DA Casey Goodman. Correct?

A. Yes, sir.

Q. And the item to be restored is a Bandidos Motorcycle Club vest. Correct?

A. Yes, sir.

Q. And that's what you call a cut. Right?

A. Yes, sir.

Q. And if you turn the page over, that's the order signing returning that. Correct?

A. Appears to be, yes, sir.

Q. And what's the date on that?

A. It's stamped May 28th, 2020.

MR. WILLIAMS: I offer to the State the Defense Exhibit 1, Your Honor.

THE COURT: Any objection?

MS. BOWEN: I would still object to relevance, Your Honor, as this is a -- this isn't even an obstruction case. This is just retaliation.

THE COURT: Overruled.

MR. WILLIAMS: Yeah.

BY MR. WILLIAMS:

Q. So the only obstruction charge against Mr. Pfeffer was dismissed by a State Court judge in 2020. Correct?
A. Yes, sir.
Q. And in order to take what you were told Mr. Pfeffer said on Snapchat, and interpret that as a threat, requires additional information that you -- based on your training and experience, you read that, based on your investigation, and you interpret that as a threat to do harm against this individual. Correct?
A. Yes, sir.
Q. Other people might interpret it differently. Correct?
A. I suppose.
Q. Now, based on that is when y'all executed the May 10th, 2024 search warrant. Correct?
A. Yes, sir.
Q. All right. And you also testified on direct about a July 31st, 2024 traffic stop involving Mr. Pfeffer as a passenger in a vehicle. Correct?
A. Yes, sir.
Q. And him being arrested as a result of that?
A. Yes, sir.
Q. Are you aware -- And he was charged in State Court for a gun crime. Correct?
A. I believe it was unlawful carrying a weapon, and

gang member.

Q. All right. I'd like to show you what's Defense Exhibit 2 -- I've already given a copy of this to -- and Defense Exhibit 3 to the Government. Would you please look at 2 and say, is that a motion to dismiss an unlawful carrying a weapon case against John Pfeffer?

A. Yes, sir.

Q. And that case was dismissed. Right? On the first page, sir.

A. Yes, sir.

Q. And it was dismissed for insufficient evidence, according to the face of that document. Right?

A. Yes, sir.

Q. And that was in -- last year, last fall. Correct? What's the date?

A. It says, "Signed and entered August 8th, 2024."

Q. So within a week of the arrest of Mr. Pfeffer, the case against him in State Court was dismissed for insufficient evidence. Correct?

A. It appears to be, yes, sir.

Q. If you could please turn to Defense Exhibit 3, sir. Is that an order to restore property?

A. Yes, sir.

Q. And is the case number on that order the same as the case number on the motion to dismiss, and order to dismiss

in Defense Exhibit 2?

A. Yes, sir.

Q. And so those -- So then, that is an order from the Court restoring Mr. Pfeffer's firearm August late last year, from the arrest on July 31st. Correct?

A. Yes, sir.

MR. WILLIAMS: I'd offer State Defense Exhibit -- and I say Defendant, I mean Defendant Pfeffer, so the record's clear, Your Honor, 2 and 3 into evidence.

MS. BOWEN: No objection, Your Honor.

THE COURT: So admitted.

BY MR. WILLIAMS:

Q. Sir, you're aware that John Pfeffer has a license from the State of Texas to carry a concealed firearm. Correct?

A. Yes, sir.

Q. And you're aware of when he received that license?

A. No, sir.

Q. But at every point in time that you've been investigating him, he's had a license to carry a handgun. Correct?

A. Again, without knowing the date, I'm not sure, sir.

Q. Well, did you seize his license at any point in time?

A. I don't recall seizing his license.

Q. Okay. Do you know which agency at the State of Texas issues concealed carry licenses?

A. I don't want to speculate, no, sir.

Q. Are you aware that it's the Texas Department of Public Safety?

A. Is it? I'm not sure.

Q. You don't know?

A. That's why I said I --

Q. Well, you work for the Texas Board of Criminal Justice. Correct?

A. Not the Department of Public Safety, yeah.

Q. Well, you've been a police officer since 2007, and you don't know who issues concealed carry licenses in the State of Texas?

A. I've said that three times. I don't want to speculate, so --

Q. All right. Do you have one? Have you ever had a concealed carry license?

A. No, sir.

Q. What did you do before you became a law enforcement officer in 2007?

A. United States Marine Corps.

Q. So you went straight from the Corps to law enforcement?

A. Yes, sir.
Q. So as a result of that, you've never been in a position where you needed a license to carry weapons as part of your job. Correct?
A. No, sir. No, sir.
Q. Okay. Fair enough. Now, you also ran a search warrant at Mr. Pfeffer's home two weeks ago, at the time of his arrest. Correct?
A. One was run. I wasn't there.
Q. Were you aware that one was run though. Correct?
A. Yes, sir.
Q. Okay. And during that search warrant execution, there were no drugs found in his home. Correct?
A. I don't believe so.
Q. And no illegal firearms found either. Right?
A. Illegal, no sir.
Q. But all the firearms this time were taken from him. Correct?
A. That were taken?
Q. They all were taken this time.
A. Yes, sir. Yes, sir.
Q. So there don't appear to be any firearms remaining at his home. Correct?
A. I don't believe so.
Q. So -- and at that point in time, Mr. Rickenbacker

also lived with Mr. Pfeffer. Correct?

A. Yes, sir.

Q. But it's Mr. Pfeffer's house, as you're aware. Correct?

A. Yes, sir.

Q. Okay. And Mr. Rickenbacker lived in a converted summer room that was converted into a guest room (indiscernible)

A. I believe so, yes, sir.

Q. Now in your investigations of Mr. Pfeffer you've never developed any information or evidence that he's ever failed to appear for court, or jumped bond, have you?

A. No, sir, I don't know that.

Q. Okay. And we've already seen that the prior Harris County cases were dismissed. Correct?

A. Yes, sir.

Q. And in this case, I think at the beginning of our cross last week, we established that, without reviewing the individual names, that there are several other cases for Banditos arguably related to this one. Correct?

A. Yes, sir.

Q. Okay. And two of those three individuals we discussed, they're all on bond. Correct?

A. From this indictment, yes, sir.

Q. Well, from the other indictment, the other three.

A. Oh, yes, sir. Yes, sir.
Q. Okay. And as far as you know, none of the other members of the Banditos that have been granted bail in those cases, I believe two out of three were granted bail, or in this indictment, no one has yet violated bail conditions. Correct?
A. I --
Q. As far as you know.
A. Yes, sir, as far as I know. And I know some of them were no longer Banditos anymore. But I'm just trying to recall who all made bond.
Q. But you're not aware of any bail violations by any Banditos in this, or the related cases, for the individual's release?
A. No, no, sir.
Q. And as you pointed out, some may have left the Banditos.
A. Yes sir.
Q. For example, Mr. Dunphy. Correct?
A. Yes, sir.
Q. And which demonstrates that people can leave the Banditos. Correct?
A. Yes, sir.
MR. WILLIAMS: I'll pass the witness, Judge.
THE COURT: Redirect?
MS. BOWEN: Just briefly, Your Honor.

REDIRECT

BY MS. BOWEN:

Q. Officer Lyons, I'm going to draw your attention back to the bylaws we talked about, and if you need a copy, let me know. The don'ts section says, "Needle use will not be tolerated." Is that correct?

A. Yes, ma'am.

Q. And does it also say that you cannot smoke any chemicals?

A. Yes, ma'am.

Q. Does it say anything about snorting any chemicals, or doing drugs in any other manner?

A. No, ma'am.

Q. And does it say specifically, as a Bandidos member, don't commit crimes?

A. It does not say that.

Q. And now going back to The Hawg Stop incident, did you have evidence that multiple rounds were fired that night?

A. Yes, ma'am.

Q. And were you able to determine who fired which rounds?

A. No, ma'am.

Q. So were you ever able to determine who exactly fired the round that hit Mr. Pfeffer?

A. No, ma'am.

Q. And now to Bimbo's, did you have multiple victims that you talked to after that night?

A. Yes, ma'am.

Q. And did those victims tell you that they were assaulted by Bandidos members unprovoked?

A. Yes, ma'am.

Q. And what did they tell you was the reason, as far as they were -- as far as they knew, that the Bandidos were angry with them?

A. Well, the Grey Beards had been a friendly club. They were not antagonistic to the Bandidos, they were very respectful and supportive. The Bandidos had been made aware, from a Grey Beards member who left the Grey Beards to join the Bandidos Nation, that the Grey Beards had met secretly or privately with Brothers East, or B*EAST, their rival, and kind of came up with a respect agreement, like we don't want to be part of this war, we're going to respect y'all, if we see you. And when the Bandidos heard about that, to them it was like, well, you've picked sides now. You've decided to side with B*EAST. Hence why they ordered the Grey Beards to attend the meeting in the first place.

Also the Grey Beards, many of them wore the red and gold bar and shield on their cuts. Many of them took it off. And that is also, combined with the information that they sided with B*EAST, that you're choosing sides. You're not allowed to

do that, or you chose the wrong side, basically. So when they were confronted about that, that led to the Banditos assaulting them as a form of discipline, and then, of course, robbing them of their cuts, and effectively shutting them down as a club. When you don't have your cuts, and you're not allowed to attend the COC, the Coalition of Clubs, you're basically done.

Q. Okay. And did you have multiple victims tell you that they were able to identify not specific members necessarily, but that the majority of the Banditos in that back area where the assault happened were members of the Welcome to Hell chapter?

A. Yes, ma'am.

Q. And did you have multiple specifically identify Mr. Pfeffer?

A. Yes, ma'am.

Q. And now turning to the threat that we had talked about, just briefly, that 2019 case against Mr. Pfeffer, that was for retaliation. Correct?

A. I think in Texas law, from what I recall, I think they have obstruction and retaliation in the same penal code violation, and it's either one or the other, depending on the elements of the offense.

Q. Okay. But it didn't have to do with the Snapchat threat that we talked about?

A. No, ma'am.

Q. Okay. And in regards to that Snapchat threat, although you were not able to see the actual threat in writing, did the victim indicate to you that he felt threatened?

A. Yeah, he was terrified.

Q. And he was worried for his safety, and his family's safety?

A. His wife, and he has several kids.

Q. Okay.

MS. BOWEN: Nothing further, Your Honor.

THE COURT: I want to clear up one thing.

MS. BOWEN: Mm-hmm.

THE COURT: The night of The Hawg Stop, after Mr. Pfeffer was injured, I'm confused as to whether there was a clip, and whether he had a gun. That testimony is confusing me at this point. So what -- Did Mr. Pfeffer have any firearms, or a clip on him, in his property?

OFFICER LYONS: Sir, we have witnesses that gave statements that Mr. Pfeffer was armed. I would need to look at the report. I believe he had a pistol magazine in his property at the hospital. That's what I can recall from all the other facts of this multi-year case. I would need to look at it again. But I'm pretty sure he did.

MR. WILLIAMS: Your Honor, I would object to that characterization because it's -- I have not printed out -- We received 3,700 pages of (indiscernible) and my recollection of

the various reports about his property do not include the pistol magazine. They included bloody clothes, brown boots, belt, shirt. And so if he has that report available for him to refresh, that would probably be helpful, because I don't --

THE COURT: Okay. But the other part, where you said witnesses identified him having a gun?

OFFICER LYONS: Yes, sir.

THE COURT: Okay. And those are in the reports?

OFFICER LYONS: Yes, sir.

THE COURT: All right. If you can figure out this clip thing, great. But we're going to move on. We can come back to that, if we need to.

MS. BOWEN: Well, we'll look into it, Your Honor. But at this time I have nothing further.

THE COURT: Okay. Any recross, briefly?

MR. WILLIAMS: No, sir.

THE COURT: Okay. All right. Mr. DeGuerin, you may proceed.

OFFICER LYONS: And Judge, can --

THE COURT: What?

OFFICER LYONS: I'm sorry, I -- Someone at the hospital had a clip. That's why I need to look at it. I don't want to falsely attribute it.

THE COURT: No, I understand.

OFFICER LYONS: That's just in my brain.

MR. WILLIAMS: Well, that's why I said if he has the (indiscernible) to refresh his memory, then that would resolve (indiscernible)

THE COURT: Right.

MS. BOWEN: Again, we're going to try and pull it (indiscernible) Your Honor.

THE COURT: Okay.

MR. WILLIAMS: Yeah.

OFFICER LYONS: My apologies.

MR. DEGUERIN: May I proceed?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. DEGUERIN:

Q. It is Officer Lyons?

A. Officer is fine, yes, sir.

Q. It isn't Detective, or --

A. Officer is fine, sir.

Q. Officer. Okay. Officer Lyons, in the same vein of the -- you were talking about the arrest of Mr. Pfeiffer. I believe also Mr. Rickenbacker was also arrested in that 2020 -- that August 1st, 2024 stop.

A. July 31st? Yeah, I think it was. Yes, sir.

Q. The July 31st (indiscernible)

A. Yes, sir.

Q. And also, that case, Mr. Rickenbacker, although

it was filed under Rickenbacker Bradley instead of Bradley Rickenbacker, it was no PC found, and the property returned. Right?

A. I honestly haven't seen it. If you all have --

Q. But you don't have any reason to dispute that?

A. If that's what it says, that's what it says, yes, sir.

Q. Yeah. And in fact, you're not privy to the pretrial report, I guess?

A. No, sir.

Q. Right. And so in the pretrial report, it reports that it was dismissed on 8/8/2024 --

A. Yes, sir.

Q. Which is consistent with what you've looked at.

A. Yes, sir.

Q. And so you don't have any reason to dispute that.

A. No, sir.

Q. As far as Mr. Rickenbacker goes, do you have any other indication that he has any other criminal history that he's been convicted of any crime, other than traffic?

A. No, sir. Just the allegations we have in this case.

Q. This case.

A. Yes, sir.

Q. Right. But in the pretrial report there, there

it shows two different arrests that both have been dismissed. You're familiar with anything out of San Patricio County?

A. Yes, sir. Yeah.

Q. And that was also dismissed?

A. From what we were told, yes, sir.

Q. How many times has Mr. Rickenbacker been detained as part of your investigation, or someone on your team's investigation? As opposed to just speeding on a highway --

A. Yes, sir.

Q. -- like actually detained, looked at, seeing if there was stuff in his car?

A. Just from what I can recall, sir, detained, I know the San Patricio, or it was out of Corpus Christi PD, which might be that county, Odom PD, I don't remember, he was detained and I believe arrested for the UCW charge that you mentioned. That was November of '21. There was a -- yes, sir. Yeah. I think it was.

Q. (indiscernible)

A. And then there was the May '21, May 13th of '21, after a shooting murder on 290 in the White Tahoe, there was a UCW case.

Q. Right. And you mentioned that in the cross.

A. Yes, sir.

Q. I know it's been -- it was last week, or it was last Thursday.

A. Yes, sir. Yes, sir.

Q. You mentioned that, let me ask you about that.

A. Yes, sir.

Q. He wasn't arrested -- he was detained, but he was not arrested (indiscernible)

A. I think he was arrested for UCW, and then I don't know if that charge -- I don't know the disposition of it.

Q. Well, in fact, I think on that occasion, his hands were bagged, he was hand-bagged?

A. Yes, sir. His hands were bagged, yeah.

Q. And all the GSW came back negative for him.

A. Yes, sir.

Q. So he was cleared of that incident. That's why it's not -- that's not in the indictment.

A. Yes, sir. I mean, it's still under our federal investigation, but there has not been any state indictment, no, sir.

Q. Right. And in count -- in Mr. Rickenbacker's charge, in count -- there's a cheat sheet on it, he's 1 through 3, and the forfeiture.

A. Okay.

Q. Does that make sense to you?

A. Yeah, I've heard of it. I'm not too familiar with it, though.

Q. Well, I have it right here, if you'd like to see

it (indiscernible)

A. Well, no, I'm talking about the forfeiture part. I'm not sure.

Q. Oh, okay. But sir, the substantive counts that he's charged with are count 1 through 3, and count 1 is kind of the overall --

A. Okay.

Q. -- the ones that start from 2019, and go up to the time of the indictment.

A. Okay. Yes, sir.

Q. Count 2 and 3 are kind of piggyback counts to count 1. Count 2 talks about the -- Let me get to the date. Hold on. September 26th, 2020, it says assault in the aid of racketeering, which is, like I said, it's a piggyback.

A. Yes, sir.

Q. It's kind of the assault that goes along with count 1.

A. Yes, sir.

Q. And then, count 3 is using or carrying or brandishing of a firearm, and that was also tied to the September 26th, 2020.

A. Yes, sir.

Q. All right. At the time of September 26th, 2020, Mr. Rickenbacker was not a Bandito. Is that correct?

A. No, sir. He was a Mascareros member.

Q. Okay. It's kind of -- A lot of what these pictures are that we got here is pictures of clothing and patches, and all this talk that we talk about Banditos. You're not here to say that being a Bandito is illegal?
A. No, sir.
Q. You're not here to say that being a member of Welcome to Hell should be -- is illegal?
A. No, no, sir, it's not illegal to be a member of Welcome to Hell.
Q. Okay. How many members are there of Welcome to Hell in your -- And I'm not going to hold you to it.
A. Yes, sir.
Q. But, I mean, within -- within five I'll hold you to it. But how many members of Welcome to Hell do you think there are?
A. Today, I'm not sure, based off our law enforcement --
Q. Maybe as of the arrest.
A. Well, I think it -- Maybe, if this is fair, like our zenith of our investigation, or you know, kind of like the crescendo of it, around 10.
Q. And how many of those are indicted?
A. Can I count them out loud to help myself?
Q. Sure. If you need, I can show you the --
A. No, I think I've -- We have John Pfeffer.

Q. I don't have the answer for you, I just have the names.

A. Oh, okay. Thanks. Thank you. Appreciate it.

MR. DEGUERIN: Oh, I'm sorry, Judge. May I approach?

THE COURT: Oh, of course.

BY MR. DEGUERIN:

A. John Pfeffer, Darvi Hinojosa, Bradley Rickenbacker, David Vargas, Sean Christison -- and then, I believe that's it. Yes, sir.

Q. And so even by that tally, just being a member of Welcome to Hell doesn't mean that you would be liable under this indictment, under these terms.

A. Can you -- I'm sorry, can you repeat, please?

A. So if you're a member of Welcome to Hell, or you're a Bandito, those associations by themselves are not criminal.

A. Yes, sir.

Q. And in fact, they're not even targeted of this indictment, some of those people.

A. Yes, sir.

Q. Some people who are a member of both.

A. Yes, sir.

Q. Having -- And those guys who are not charged in here, they probably have a 1% on their --

A. Yes, sir.

Q. -- on their patch too. Right?
A. Yes, sir.
Q. There's a lot of pomp and circumstances to the motorcycle club worldwide, with what cuts you can wear, and what rockers are allowed. I mean, there's --
A. There's a lot of rules, yes, sir.
Q. And that's across all the motorcycle clubs in general. Right?
A. I believe so. I don't know the specifics and the strictness of some of the other clubs, just from lack of knowledge, that they're not in this area.
Q. Are you specifically assigned to Bandidos? Are you -- Or I mean, is that your focus? Or do you have other --
A. We've been investigating, really, over these past several years the three gangs that have been part of this war. So that's kind of where our focus has been. I'm not assigned to one, but that would be Banditos, Brothers East, and the Homietos.
Q. Okay. Which at least in count 1, 2, and 3, which Mr. Rickenbacker -- we're not talking about any Homietos, or anything in that?
A. No, sir. I don't believe Homietos are in this indictment at all.
Q. Okay. But that's kind of an interesting question, too. Are there any Grey Beards indicted, as far as

you know, Federally or State, in response? Because there are people who have been hurt on both sides. Right? There's Banditos that have been killed --

A. Yes, sir. Yes, sir.

Q. -- and there's Grey Beards that have been --

A. Well, Grey Beards, this is the only time they popped up in our investigation, is this part of the indictment.

Q. Well, maybe I can more, I guess -- So Grey Beards, thank you for that clarification. Brothers East, there's beefing going both ways?

A. Oh, yes, sir.

Q. Have any of the B*EAST members that you are aware of, are they charged Federally?

A. There have been Federal charges against B*EAST members under different statutes, and investigations ongoing.

Q. In regards to this timeframe, this 2019 through today?

A. There have been crimes within that, within the war that they have been charged with, yes, sir.

Q. But not -- They're not included in this indictment?

A. No, sir.

Q. Okay. So you said that there was a time that -- We talked about the August -- or July 31st --

A. Yes, sir.

Q. -- that you found Mr. Rickenbacker in a car with Mr. Pfeiffer, and I think Mr. Vargas, too. Right?

A. Yes, sir.

Q. It was all three of them.

A. And then Sean Christison, yes, sir.

Q. But that was a traffic stop. Right?

A. Yes, sir, it was a traffic stop.

Q. And he was arrested on traffic. And I understand that in Texas, you can arrest people on traffic. But how often do you arrest people on traffic offenses?

A. I don't work traffic, and I'm not sure what the policies are.

Q. I guess that's a good point. Did you direct them to stop him on traffic?

A. I wasn't there. I wasn't present at the scene.

Q. You weren't part of that investigation.

A. I wasn't out there.

Q. Do you know if there was an order given to find traffic on that stop?

A. I'm not aware.

Q. How soon after the traffic stop did people from the task force, or agents, or other people show up to that scene?

A. Show up to the scene of the traffic stop, or to pull it over?

Q. Yeah, to the scene of the traffic stop.
A. That, sir, I don't know.
Q. Pretty quick, I assume. Right?
A. I don't know. I'm sorry.
Q. But in any regard, Mr. Rickenbacker, you don't have any indication that he was rude, or just --
A. I never got any information about their behavior from the stop.
Q. Or being inappropriate, trying to run?
A. I'm not -- I'm not aware of that.
Q. If there was something, you probably would have known it. Right?
A. Yes, sir. Yeah.
Q. They would have said, hey, Rickenbacker was trying to leave, or trying to run --
A. Yes, sir. Yes, sir.
Q. -- or smelled of something. I mean, there wasn't any indication. Other than what we know is that he was stopped, they found a firearm that he took credit for, and that ultimately was dismissed, and property returned.
A. Yes, sir.
Q. And the same thing in the San Patricio. There's nothing to say that he was trying to flee, or tried to run, or -- There's nothing to show that he was -- other than being stopped with his firearm, that's it. Right?

A. Yes, sir. Yes, sir.
Q. Do you have any indication that he's ever missed a court date of any sort?
A. I am not aware of that.
Q. And if there was a warrant issued somewhere, probably at least from 2019, when you were focused in on this, through all the way to today, if there was ever a warrant issued for Mr. Rickenbacker for him not showing up to court, or not showing up where he was supposed to be, you would have learned about it?
A. I probably would have learned about it, yes, sir.
Q. So in investigating Mr. Rickenbacker, you -- I assume that the first time that you went and you met him was not the first time that you saw his name in paperwork?
A. Yes, sir.
Q. When was the first time you, specifically, met Mr. Rickenbacker?
A. Oh --
Q. I know there was a, because it was provided to us, there was a time that he was arrested, he was given an opportunity --
A. Right.
Q. -- and he took -- and he exercised his Fifth Amendment right. Right? That's one, at least.
A. Well, I'm not sure if I was even at that one.

I'm just trying to recall the first time that I, like, made face-to-face contact with him. It might have been during the search warrant at Mr. Pfeffer's house in May, over the witness tampering charge.

Q. Right.

A. Because he was living there at the time.

Q. But -- and you kind of threw that out there.

A. I'm sorry.

Q. He was obviously, he was not a suspect in any witness tampering?

A. No, he was not a suspect in that, no, sir.

Q. And other than what we've talked about, these incidents --

A. Yes, sir.

Q. -- Mr. Rickenbacker is not -- I mean, he's shown up in your radar, but you don't have any other questions about witness tampering, or anything other than the three incidents that you've already testified about?

A. Yes, sir.

Q. And you're not -- Not to open another can of worms, I assume that everything that you presented about Mr. Rickenbacker on Thursday is what you have about Mr. Rickenbacker?

A. I believe so. But again, I just have to answer to what's asked of me.

Q. Sure, sure. But when we're here, and we're trying to determine -- This is not a probable cause case?

A. Yes, sir.

Q. You're not trying to determine whether you -- Your duty was -- Did you testify in front of the Grand Jury? I'm not asking you (indiscernible)

A. No, sir, I did not. No.

Q. Okay. So the Grand Jury has returned the indictment, and in that indictment, we've already talked about there's these three charges with Mr. Rickenbacker, plus a forfeiture. The specific date that Mr. Rickenbacker is involved in is this -- or two dates, the 2020 that we talked about, and the 2023.

A. Yes, sir.

Q. Okay. The count 2 and 3 are 2020.

A. Yes, sir.

Q. So they're not even this more recent one. And at that time, we've established Mr. Rickenbacker was not a Bandito.

A. For 2020, no, sir. Right.

Q. In 2023, what was his status at that time?

A. For the Bimbo's assault, he was a member of the Welcome to Hell chapter. I believe he was still the secretary-treasurer at the time.

Q. Could he have been a prospect at that time, and

then later --

A. No, sir. 2020 -- He was never a prospect. He came over as a probationary member, which is almost on the level of a prospect, but it's a little different, because he had come from the Mascareros. Sometimes the Bandidos will let you probate instead of prospect. You really have to go through some of the same rules, but you can fly different patches, and it's just kind of a different status since you've kind of proven yourself a little bit more than a prospect has.

Q. That's kind of -- You're sparking a question in my mind kind of, too. It's not illegal to buy or sell patches. Right?

A. Oh, no sir.

Q. In fact, Amazon sells Bandido stuff. Right? You can get a patch --

A. I don't know if they should.

Q. Well, they can though. Right? And it doesn't mean that anybody on Amazon's a criminal. Right?

A. No, sir.

Q. And you can buy the -- What is it you were saying, the (indiscernible) here, I'll look it up so I won't embarrass myself.

MR. DEGUERIN: One second, Judge. Sorry. I'm drawing a blank.

BY MR. DEGUERIN:

Q. The Expect No Mercy patch that we talked -- You talked a lot about that, and that that's something that's earned, that they give their -- You can also buy that online, too.

A. You cannot.

Q. You can't?

A. If, if you can, you're -- and they catch you with it, you're going to get in trouble.

Q. Well, that's -- there's two different things. There's like, what you can, and what you can't (indiscernible)

A. Oh, well, yeah. Now again, sorry, if like, someone is unauthorized selling that, it's a free country, I assume they can, but you better be careful wearing it in or around Banditos.

Q. Yeah. If I were to show you an Expect No Mercy badge being sold on Amazon, that wouldn't be a surprise to you? Or it would be a surprise to you?

A. Well, yeah, it actually would be, just for that reason, that you're inviting trouble.

Q. Jeff Bezos is worried about what may happen to him.

A. Sorry?

Q. Jeff Bezos may worry about what's going to happen to him?

A. Yeah.

Q. I understand there's a difference between you wearing --

A. Yes, sir. Yes, sir.

Q. If you're wearing a -- and it can be any motorcycle group. If you're wearing a rival thing, or if you're wearing something that's not earned --

A. Yes, sir.

Q. -- I'm sure that there's some disrespect. But as far as legally goes, there's no problem buying and selling those patches?

A. Well, again, being from what -- Tate, I'm sorry, I forgot your last name

MR. WILLIAMS: Williams.

BY MR. DEGUERIN:

A. -- had brought up about their, you know, trademark status, I'm not sure what the rules are about selling their merchandise online, by somebody that's not authorized to sell it.

Q. Yeah.

MR. DEGUERIN: May I approach, Judge?

THE COURT: Sure.

BY MR. DEGUERIN:

Q. I'm just going to show you something. I'm not going to mark my whole computer. But just to kind of understand what I'm saying, like, you can see what that is?

A. Yes, sir. I would not consider that for the Bandidos though, because it's black and gold -- I'm sorry, it's black and silver, so that's not Bandidos-related.

Q. Well (indiscernible) make sense for the record.

A. Okay.

Q. I showed you an Amazon website that --

A. (indiscernible) yeah, sorry.

Q. -- that shows that you can buy patches that say Expect No Mercy. Now, point taken --

A. Yes, sir.

Q. -- the colors make a difference, too.

A. Colors make a difference. And really, because the Bandidos is the circular one, so the shape of the patch, the colors -- Yes, the phrase "Expect No Mercy" cannot be trademarked, but that's not a Bandidos patch. So that can definitely -- Anybody can get that, I assume, without any ramifications.

Q. Sure, I mean, well -- And that obviously is something that you can buy. You could probably make it.

A. Yes, sir.

Q. You could go to Etsy, you know, wherever you can do it.

A. Yes, sir.

Q. It's about (indiscernible) and ironing. But at least we know that Expect No Mercy is something that is not

just specific to the Bandidos.

A. Just the patch design, and colors, yes, sir.

Q. Okay. So that idea of earning that patch could be different --

A. I guess you can just buy that one.

Q. Yeah. Now, there is -- Defense -- or Government's Exhibit 7 was not admitted into evidence. I think that you read from it. Are you familiar? I'm going to hand it --

THE COURT: Is that the one that has personal information on it?

MR. DEGUERIN: Yes. But I'm going to just hand it to him for review.

OFFICER LYONS: Sorry.

BY MR. DEGUERIN:

Q. Now, 7 was the -- is the application, I guess, by Rickenbacker?

A. Yes, sir.

Q. Okay. And I think you said that that was recovered somewhere in New Mexico?

A. Yes, sir, this one I believe was.

Q. And that is something that -- Well, I'm going to have you --

A. Yes, sir.

Q. Okay.

A. Yes, sir. Yes, sir.
Q. The -- So this is something that's actually filed with the national Bandidos?
A. The way the background process works is this application is filled out, it's sent to Austin, and then it's sent to an attorney to do a background check.
Q. Are there actual background checks made on prospects?
A. Yes, sir.
Q. Let me ask you, and the reason I kind of pointed it out to you, in this application, and also in the pretrial report, and also just in your general knowledge, do you know that Mr. Rickenbacker served in the Navy?
A. Yes, sir.
Q. And if I'd say it was from 2006 to 2012, you wouldn't dispute that?
A. No, sir.
Q. And that he was honorably discharged from the Navy?
A. I saw that, yes, sir.
Q. Since then, so we're talking about 2012, that's before this investigation --
A. Yes, sir.
Q. But as you've been focusing in, or had Mr. Rickenbacker on your radar, do you know what he does for a

living?

A. No, sir.

Q. You don't know that he was an elevator repairman or technician?

A. I think I remember either he put that on the application, or I've seen it somewhere else. But in terms of being gainfully employed, I don't know about that.

Q. Is it your experience that a lot of the members of motorcycle clubs do have employment, and have steady jobs?

A. Honestly, sir, it kind of comes and goes, just based off the individual. Some do, some don't. Some are in between jobs.

Q. And I guess -- do you see some bouncing from group to group, or from area to area? Like if you move from Texas to Colorado, you can move groups that way, or --

A. It all depends on whether you're -- if the Banditos, if you were a Bandito and you move to Colorado, they do have Banditos in Colorado. If you go to a state that --

Q. Doesn't --

A. -- is a Mongols area or state, or it's claimed or disputed, you don't have to quit, but you might not be, you know, proudly wearing your cuts, or else something bad might happen.

Q. In that, do you kind of monitor -- I assume that since 2019, you've been focusing on this, that's since the

indictment in 2019 --

A. Yes, sir.

Q. -- on this group, in this area of --

A. We're focusing on other groups, but this is one of them, yeah.

Q. If you were hearing in chatter that people were about to leave, and when I say chatter, text messages, or snitches or confidential informants, or just concerned citizens that someone's going to leave, you would kind of pick up on that?

A. Leaving?

Q. Leaving like, the jurisdiction, or leaving the --

A. Oh, yes, sir. Just if someone's sick, or got a job, or moving, we would typically hear it, if they were a -- someone that's part of our investigation.

Q. And specifically with Mr. Rickenbacker, you don't have any indication that he's going anywhere, or leaving the jurisdiction?

A. Only on runs or rides.

Q. But runs are --

A. But not, yeah, but not, like, staying and moving there.

Q. Runs or rides being, that's the (indiscernible) for --

A. Yes, I'm sorry. Just going on a motorcycle ride.

Like whether they host events and parties across the United States, that's what they call runs.

Q. But you have no indication that he's planning to flee, or go anywhere?

A. No, sir.

Q. All right. The -- And I guess, not to -- I guess if I'm saying I shouldn't belabor the point, I should just stop. Mr. Rickenbacker's room, that has all the -- it looks like maybe a -- like a college person may, if they follow the (indiscernible)

A. Yes, sir.

Q. His is a room that looks -- There's no -- He's not hiding the fact that he is a Bandito.

A. No, sir. No, sir.

Q. And in fact, what -- you said that they kind of wear their colors to show us who they are.

A. No, they're -- And really, you see that amongst the allied motorcycle gangs, is they are very proud.

Q. And that goes to the point too, is like, just because somebody has all these colors and all these things, that's not evidence of a crime.

A. It can be.

Q. Well, it's evidence of an association.

A. By what I meant is, like for example, the Expect No Mercy, if we have that you earned that patch from a specific

act of violence, then thus, that patch itself is now evidence of our crime, because we've been able to see someone did not have that patch, went and participated in the event, and now has that patch.

Q. In all fairness, Officer, that's speculation. Right? You're speculating. You're like, you know what a patch means, and you see something --

A. Yes, sir.

Q. -- and you're putting those together. That's --

A. It's part of the investigation, yes.

Q. That's the province of the jury. Right?

A. Yes, sir. Yes, sir.

Q. Okay.

A. Yes, sir.

Q. But as far as what happens with wearing a red and yellow, or wearing a Fat Mexican patch --

A. Yes, sir.

Q. -- or any of those things, that's expression, and that's something we allow in this country.

A. Yes, sir.

Q. And freedom of association we allow.

A. Yes, sir.

Q. So just the association of these guys together, and the fact that Mr. Rickenbacker lived with John Pfeffer doesn't make him more guilty of an offense. It's just that's

where he lives.

A. Yes, sir.

Q. And that's his association.

A. Yes, sir.

MR. DEGUERIN: Okay. I'll pass witness.

THE COURT: Okay. Redirect.

MS. BOWEN: I don't have any redirect, Your Honor. But I did want to mention that we found the report that we were discussing, with The Hawg Stop incident, and the magazine from the hospital.

THE COURT: Okay.

MS. BOWEN: This report states that three paper bags with a sticker were given to an investigator in that case, with Mr. Pfeffer's name, and in one of the bags there were blue jeans with miscellaneous items in the pockets, one of which was a Glock 9mm magazine, with eight live cartridges.

MR. WILLIAMS: May I see that, Your Honor?

THE COURT: Sure.

MR. WILLIAMS: (indiscernible)

THE COURT: And if you need to ask questions, you can do that.

MR. WILLIAMS: May I briefly ask the witness some questions, Your Honor?

THE COURT: Yes, you may.

MR. WILLIAMS: Okay.

RECROSS

BY MR. WILLIAMS:

Q. Officer, you're aware that y'all also ran gunshot residue testing on Mr. Pfeffer's clothes that were recovered from the hospital?

A. Yes, sir.

Q. And those were negative -- Were there any positive results from those?

A. Yes, sir, there was.

Q. On which item of clothing?

A. On I believe it was the right sleeve of his gray shirt. I think it's the right sleeve.

Q. And who did the testing on that?

A. I would assume the Harris County Institute of Forensic Science.

Q. Okay.

A. And that's in the discovery.

Q. Okay. But he was never charged with a crime related to that shooting prior to this indictment. Correct?

A. Not prior to this indictment.

Q. Okay.

THE COURT: All right. Mr. Wakefield, you may proceed.

MR. WAKEFIELD: Yes, Judge.

CROSS-EXAMINATION

BY MR. WAKEFIELD:

Q. All right. The charges that Mr. Vargas has, there are four of them, one is a murder, and the other one is, I think it was mentioned earlier, it was kind of like a tag-along charge of using a weapon, using a firearm. Is that right?

A. The 924(c), sir? Yes, sir.

Q. Okay. And then the following one was attempted murder, and then once again, the fourth charge was essentially the same crime, it's just using a weapon. Correct?

A. It's -- yeah. Yes, sir. So it's all the one incident, I believe.

Q. It's just the one incident. Right?

A. Yes, sir. Yes, sir.

Q. Now, Mr. Vargas has been on bond for this incident for 30 months prior to today. Is that correct?

A. I know it was some time, yes, sir.

Q. Yeah, but I mean, but about 30 months.

A. Yes, sir. Yes.

Q. All right. I'm going to show you -- Now, I'm going to change it to V -- it's to Vargas, V1, but anyway -- Give me one second. I'm going to show you V11, 13, and 15. All right?

MR. WAKEFIELD: May I approach, Judge?

THE COURT: Yes.

BY MR. WAKEFIELD:

Q. Okay. Now, these three, as I'm showing these to you, do these look like the indictments that were returned in the State Case that was against Mr. Vargas for all three charges? Basically two aggravated assaults, and one murder.

A. Yes, sir. Looks to be.

MR. WAKEFIELD: Judge, I need to do some redactions on this. So just for the purposes, I'm going to ask to admit them, but then I'm going to redact them just before they go into the Court's record. Is that all right?

What I can do, Judge, I can actually move to admit them after I do the testimony. That way, I can just (indiscernible)

THE COURT: Right. Let's do that.

MR. WAKEFIELD: Okay.

BY MR. WAKEFIELD:

Q. All right. Now, with these three charges, he was actually being charged with his back in 2021. Correct?

A. Yes, sir.

Q. December of 2021 he's charged with this?

A. Yes, sir.

Q. And these are the exact same three charges he's looking at here. Correct?

A. Well, I guess four, but they're named different. Yeah.

Page 76

Q. What I mean is that the murder and the attempted murders are the exact same facts, exact same, you know, complainants, everything, as the murder and the aggravated assault in the State case.

A. I believe so, yes, sir.

Q. All right. And with those things, when he was arrested in 2015, he was given a bond. Correct?

A. 2015?

Q. I'm sorry.

A. That's okay.

Q. Twelve -- I'm sorry, 12/15.

A. Oh, 12/15. I'm sorry.

Q. Yeah, 12.15.

A. Yes, sir, he was given a bond.

Q. All right. I'm going to show you what's been marked as Government's -- or sorry, Defense Exhibit V3. Does that appear to be the order of the conditions of release?

A. Yes, sir.

Q. All right. Now, if you'll notice on that order, there are things that he had to comply with. For example, no new law violations. Correct? And the way you can see it, on the left side, there should be a little check box that shows what's been ordered.

A. Yes, sir.

Q. Okay. No drugs. Is that correct?

A. I don't see the drug. I just see the no law violations, which I guess the drugs are part of.
Q. No law violations (indiscernible)
A. (indiscernible)
Q. No possessing marijuana, or any controlled substance?
A. Yes, sir.
Q. No possession of a firearm?
A. Yes, sir.
Q. And this is a big one. It says the Defendant is required to submit to GPS monitoring. Is that right?
A. Yes, sir.
Q. All right. And below that it says that there will be a curfew of 12 a.m. to 11:59 p.m. seven days a week. Does that appear to be like what we would call house arrest?
A. Yes, sir. Unless, you know, you're working I guess, or --
Q. Well in this particular case, there's no allocation for working. Right?
A. Okay. Then, yeah.
Q. Basically, he is under house arrest. Right?
A. Okay. Yes, sir.
Q. Do you know how long he lasted for -- I mean, not lasted. Do you know how long he was under house arrest for?
A. No, sir.

Q. All right. I want to show you -- Would it surprise you to find out it's about six months? I'm going to show you what has been marked as Defense Exhibit V7. All right? This is what's called an order to amend an order. The ones where it says an M there, that M is what they've changed.

A. Okay.

Q. You can tell the Court what they've changed.

A. Yes, sir. Do you -- I'm sorry, what?

Q. You can just read it for the Court, right there.

A. "Remain at residence between the hours of 7:30 p.m. and 6 a.m. Mr. Vargas is allowed to leave home at 6 a.m., and must return by 7:30 p.m. On non-work days, he is allowed to leave the home between 8 a.m., and must return home by 1 p.m."

Q. All right. Now, this is, at the top right-hand corner, is June 11th, 2022. Is that what it says?

A. Yes, sir.

Q. So that's basically about six months after he was arrested in December. Now, it's June -- actually, about seven months, and now he is -- They've changed it. Right?

A. Yes, sir.

Q. Now, he's still under GPS, but at this point, he now has a curfew, and he can actually go, he can leave during the daytime, and come back. All right?

A. Yes, sir.

Q. Now, one thing that you mentioned earlier is that you're kind of aware when -- You would find out if there was some sort of an arrest warrant issued against Mr. Vargas at any time. Correct?
A. Typically, yes, sir.
Q. All right. At no time during these, any of these times that he was on these conditions, was he ever violating these orders, because no order was actually issued for him to be arrested. Correct?
A. We had information he was violating, but they wouldn't violate.
Q. The Court never issued any order. Right?
A. No, sir. No, sir.
Q. All right. Now, the next thing I want to show you is what is marked as Defense Exhibit 9. This is another amended order. Right?
A. Yes, sir.
Q. Now this one, and this is a little bit different because it's saying that he's got to pay for it, the GPS.
A. Yes, sir.
Q. But the big one I want you to look for is the fact that (indiscernible) Oh, here it is. I'm sorry. There is an additional change to the curfew. Can you read what it is for the Court, please?
A. Just that part?

Q. Yes.

A. "Defendant will observe an initial curfew from 10 p.m. until 5 a.m. seven days per week, and will abide by all the terms and conditions of the contractual agreements required for participation in the electronic monitoring."

Q. Perfect. That's perfect. And that, again, is October 25th, 2021?

A. Yes, sir.

Q. So essentially, that's about five months later, after he had the last change. Right?

A. Yes, sir.

Q. Now, this actually is less restrictive.

A. Yes, sir.

Q. Because now it's seven days a week, he's allowed even more time during the day time to be out and about. Correct?

A. Yes, sir.

Q. All right. And those things, again, during all this time, we don't see any arrest warrants that are submitted. Correct?

A. No arrest warrants, no, sir.

Q. All right. Next thing I'm going to show you is what is marked as Defense Exhibit 10, V10. The big one -- Same kind of thing, it's an amended order. But the big one I want you to read is buried here in the back.

A. Yes, sir.

Q. What does that one say?

A. "Delete curfew off of GPS. Defendant to keep GPS monitor."

Q. And this date was?

A. 2 February 23.

Q. All right. So these are the last orders for his conditions of his supervision while he was on bond for this case. All right? Now, that continued in effect all the way until the following May of 2024. So that's about 10 months ago. He was under bond restrictions all that time. Is that correct?

A. I believe so, yes, sir.

Q. All right. Now, during that time, I'm going to show you, now, this one may be a little tough, I'm going to show you what has been marked as Defense Exhibit V2. Did the State -- or the Government, did the Government show you this earlier?

A. I don't think so.

Q. Okay. What you're looking at here, this is essentially all of the filings the State has done during their prosecution of the Defendant. There's over 600 documents that are in here. And I know you haven't had an opportunity to read this, but I -- would it surprise you to find out there was not a single bond violation ever filed by the State of Texas.

A. An actual bond violation report issued, yes, you're right, we never received that information.

Q. You never received a single, like, word from Texas State that he violated a single condition of his bond.

A. We had spoken with them.

Q. What I'm asking you is if the State had ever filed anything that indicated that.

A. The State did not file, no sir.

Q. Did the Court ever filed any kind of a motion?

A. No, sir. No, sir.

Q. So as far as the Court records are concerned, would it surprise you to find out that he was perfect on his bond for 30 months?

A. The Court believed he was perfect, yes, sir.

Q. All right. Now, during the time that he was on bond, I'm going to show you what has been marked as Defense Exhibit V1. All right? This particular document shows settings of every court setting that was done. You'll notice that there are nine settings for pretrial conferences. You see that?

A. I see several pretrial conferences, yes, sir.

Q. All right. On the far right side of that, you should see a thing that says "Defendant present." Do you see that?

A. On some of them, yes, sir.

Page 83

Q. Some of the ones, the ones where it says "Defendant present," that means he was -- well, does that make sense that it would mean that he had appeared?

A. Yes, sir. That he was there, yes, sir.

Q. All right. And all the time he was on bond, would it surprise you to find out that he made it to every single court setting that he was required to be at?

A. That's what it says, yes, sir.

Q. And that not only was he there, once again, he never violated any of those conditions.

A. Yes, sir.

Q. All right. Now, I want to turn a little bit to the Government's case that you had mentioned earlier about what he's charged with. All right. You testified that, and Miss -- I think there was a clarification in the error, the Government asked you that witnesses had identified him, and picked him out of a photo record. Correct me if I'm wrong, it's just one guy. Right?

A. One witness, you're asking?

Q. Yes.

A. That did the photo line-up? Yes, sir.

Q. There was only one witness that identifies my client, that had anything to do with this. Correct?

A. Victim, witness, yes, sir.

Q. All right.

THE COURT: For which incident?

MR. WAKEFIELD: And this is for the one that's going to be called the Blue Bayou incident. This is the one that took place in September of 2021.

OFFICER LYONS: November 2nd, 2021.

MR. WAKEFIELD: November, November of 2021. Thank you.

BY MR. WAKEFIELD:

Q. All right? Now, we're going to identify him as KC, but he's the only person who actually is able to identify my client. Is that correct?

A. From, like, in terms of what he said, that he pulled the trigger, yes, sir.

Q. All right. Now, the day of the actual -- the incident, KC was interviewed by a man named Sergeant Arrington that night. Is that correct?

A. I'm not sure, sir. I would need to see it. I'm not sure who interviewed him that night.

Q. His initial interview at the scene, no suspect was developed at that time. Correct?

A. Yes, sir.

Q. And at the initial scene, not the one until the following later, the following day, I'm talking about at the day itself, the initial scene, your testimony is you believe that a suspect was identified then?

A. No, sir.
Q. Okay, no.
A. No, yeah. No.
Q. Okay. I'm sorry. Yes, okay. Correct. All right. Then there was an anonymous tip that was given to law enforcement. Is that correct?
A. We received a tip, yes, sir.
Q. All right. And that tip included an Instagram page, and it showed a picture of David Vargas. Is that correct?
A. Yes, sir.
Q. All right. Following that tip, was there an interview conducted with KC again?
A. I am not sure of the date correlation, sir, of, like, when it came in.
Q. Yes, but it makes sense that it would be following that?
A. Yes, sir. Yes, sir.
Q. And in that interview, did KC give you guys the same Instagram photo?
A. I would need to see that report. But I do remember he gave an Instagram photo. I'm not sure if it was at that interview, or not, or again, which -- which one it was.
Q. But from that photograph given to you by KC, and this, you know, anonymous tipster, that is actually where the

identity came to put him in the photo. Right? Correct?

A. It was actually, from what we found out later, it was already --

Q. I'm not asking about later.

A. Okay.

Q. Because that same day that he gave you the Instagram photograph, that was the day that a photo spread was presented to him. Same day.

A. I'm not sure, sir. Again, I didn't take part in that photo spread, or the interviews of him, so I don't know the dates on them.

Q. Pretend I'm not lying to you. It was the same day.

A. Okay.

Q. All right. So which means that the reason that he was showing a photo array that included a picture of my client is because he had actually supplied you with an Instagram paragraph, correct, or Instagram photo. Correct?

A. I guess he was ID'ing who he knew.

Q. All right. Now, you mentioned also there was a phone ping.

A. Yes, sir.

Q. Okay. And you said the phone ping was in the area of the shooting. Is that right?

A. Right on top of it.

Q. And this phone ping was currently west of where the shooting took place, I think was what I read in some of the Jencks that was turned over.
A. I'm picturing the phone map in my head. I believe it was where the Blue Bayou restaurant was, it was just, like, I guess, left or west, just --
Q. West.
A. -- barely. Yes sir.
Q. Now, the ping that I could see was at 8:45pm that night. In the offense report, the approximated time of the shooting was 9:45pm. Does that sound about right?
A. I would need to look at it, sir. I'm sorry, but --
Q. Give me one second, Officer.
A. I just don't want to testify falsely.
Q. Well, I don't want you to do that either.
A. Yes, sir, and that's what that one, yes, sir, said. I know there were various times, because the crime scene was very -- big.
Q. It's an approximation.
A. Yes, sir.
Q. It's an approximation.
A. Approximation.
Q. So essentially, the ping was from approximately an hour before the actual shooting took place, approximately.

Correct?

A. I -- Yes, sir, I would guess so.

Q. Let's say, for example, I live 45 minutes away. I then leave home and show up here, but my phone could still ping at my house an hour ago. Right?

A. If you were here?

Q. No, I'm asking you if my phone had a ping an hour ago.

A. No (indiscernible) I'm sorry, I didn't -- I didn't (indiscernible)

THE COURT: All right. Where are we going with this? How is this related to detention?

MR. WAKEFIELD: The issue I have, Judge, is that part of your calculus is going to be the strength of the case, and likelihood of conviction. It is also going to be, because this is a death-eligible case, the strength of the case is key to that decision, too. And I think it's germane for you to make a calculation of what you can release him on bond based on the strength of likelihood of conviction. I'm about to complete this portion of it, Judge.

THE COURT: All right. Well, you know, I'm not interested in any suppression issues, or anything like that. It doesn't apply here. But I understand what your point is, and so this will go to the weight of the evidence. So..

MR. WAKEFIELD: That's correct, Judge. That's all

I'm doing.

THE COURT: But we're not going to get into expert testimony on what a ping, and cell site, and all that other stuff.

MR. WAKEFIELD: We're just going off of clocks at this point, Judge.

THE COURT: Okay.

MR. WAKEFIELD: Nothing more than that.

BY MR. WAKEFIELD:

Q. All right. But outside of that photo array, the identification by KC, and that ping, that is the two things that you had mentioned in direct you had relied upon to file the charge?

A. No, sir. He also had a picture of KC on his phone before the shooting.

Q. And we will get there. We will get there. But other than that picture, those two things, that's it. Right?

A. Those three things, yes.

Q. Those three things. Okay. All right. So at this point, I want to look at --

MR. WAKEFIELD: Can you show me Exhibit 16 in your guys' exhibit?

THE COURT: Are you going to offer the bond conditions, and things that you were talking about?

MR. WAKEFIELD: I sure am, Judge. The only thing I

wanted to do is I just wanted to -- And I will, Judge. I want to just redact a couple of things. For example, some of the names that were in the indictments, that are actually initialed, I just want to make sure -- Also, I think his date of birth is on it. That's the only thing.

THE COURT: You can go ahead and submit the bond conditions.

MR. WAKEFIELD: I can do that?

THE COURT: I mean, that's a public document. You probably pulled it off a public website.

MR. WAKEFIELD: They are all public documents, and they are all from public websites, Judge. I'll go ahead and admit -- At this time, I'll move to admit Defense 10, 9, 7, and 3. It will be V10, V9, V7, and V3.

THE COURT: I assume no objections?

MS. BOWEN: No objection, Your Honor.

THE COURT: All right. Admitted.

MR. WAKEFIELD: All right. Thank you.

THE COURT: Thank you.

BY MR. WAKEFIELD:

Q. All right. Now, I'm looking at Exhibit number 16, and I'll come over to you real quick. You remember this one. Right?

A. Yes, sir.

Q. Okay. And that's the photograph you just talked

to the Judge about. Correct?

A. Yes, sir.

Q. Correct me if I'm wrong, but the date on that is five months prior to the shooting. Is that correct?

A. June, yes, sir. So five months.

Q. Five months prior to the shooting. So this photograph that was on his phone, that was part of the evidence, was actually five months, or almost half a year prior to the shooting.

A. I thought you meant the Federal indictment, not the State charge, when you asked --

Q. (indiscernible)

A. Oh, the State charge, yeah, we did not have that at the time.

Q. Okay. All right. So other question I have for you --

MR. WAKEFIELD: Can I see number 7? I'm going in order here too, so (indiscernible) and then, here's this one. Here's this one. Thank you.

BY MR. WAKEFIELD:

Q. All right. I'm showing you 17. Okay? Exhibit 17 was shown, and this is apparently a picture of a patch. Is that correct?

A. Yes, sir.

Q. And once again, this is also five months prior to

the shooting. Correct?

A. Yes, sir. Yes, sir.

Q. Now, we know that this picture of this conversation has nothing to do with the shooting itself. Right?

A. It doesn't -- it doesn't appear to be, no, sir.

Q. Okay. So that has nothing to do -- that is not evidence of the shooting. That's just a picture of a patch from five months prior.

MR. WAKEFIELD: Can I see 19, please?

BY MR. WAKEFIELD:

Q. All right, I'm showing you, this is what you had identified earlier as Government's Exhibit 19. Correct? This is another one where he is talking to an individual on his phone.

A. Yes, sir.

Q. All right. One of the things that's mentioned, and it's very important, is that he talks about going -- Do you need glasses?

A. I probably do, but I'm okay. I'm getting old.

Q. He talks about going to jail, "and some stupid shit." That's actually a line that he uses. Is that correct?

A. Yes, sir.

Q. All right. Now, this date of this (indiscernible) was actually from December 11th, 2021. Is that

correct?

A. Yes, sir.

Q. Now, you and I both know that he was not arrested by anyone for anything on that date. The actual date of the arrest for the murder was the 15th of December, not the 11th.

Q. Okay.

Q. Therefore, in this particular instance, and you've seen his criminal record, he was not arrested for anything that day. Right?

A. Yeah, I'm not sure, I guess, then which -- which incident he's referring to.

Q. Let me ask you a question. Is it possible he's making it up because he's talking to a female?

A. Making up that he went to jail?

Q. Yes.

A. That's possible.

Q. I mean, again, this is prior to when he was arrested (indiscernible)

A. For the State murder? Yes, sir.

Q. -- so it really has nothing to do with (indiscernible) Right?

A. That text message, no, sir.

Q. Okay. All right. And correct me if I'm wrong, but the way she refers to it is, "That's amazing. Congratulations, Babe." Yes?

A. That is babe, yes, sir.

Q. All right. With that in mind, let's move to Exhibit number 20

MR. WAKEFIELD: Thank you so much. I think that's my last one. (indiscernible)

OFFICER LYONS: That's what I need.

MR. WAKEFIELD: (indiscernible)

OFFICER LYONS: I look like a real detective, don't I?

BY MR. WAKEFIELD:

Q. I'm showing you Exhibit 20 here. Okay? Now, this is important. Now, you had mentioned earlier --

A. You want me to grab that?

Q. You can go right ahead. Now, the person he's talking to is identified in his phone as Mexican Bear. Is that correct?

A. Yes, sir.

Q. Now, you originally in direct said that you identified Mexican Bear as who?

A. I don't know if I gave his name, did I?

Q. Well, you didn't say his name. You said he was some sort of a member (indiscernible)

A. He was a Bandito, yes, sir.

Q. Okay. If you take a look at just a little bit down, where the person identified as Mexican Bear is saying,

"Zaddy, Daddy -- " can you read that one please?

A. You're going to make me read that?

Q. I gave you a magnifying glass.

A. No, I meant that because of the silliness.

Q. That is pretty silly.

A. "I don't want to see your Zaddy, I want to see my Daddy."

Q. And you also see that there's emojis after that. Correct?

A. I can see there's emojis, but I cannot see what those emojis are.

Q. I totally get it. But there's definitely emojis there. Right?

A. Yes, sir.

Q. All right. Let me see another one, please, and I'll give that to you. Yeah, read that one for me, what Mexican Bear says down there.

A. "You's a gangsta, babe. I get it. And it's definitely a turn on."

Q. All right. Last one. All right. What's the last one there? Just this one right there.

A. That one?

Q. Yeah.

A. "Babe, that's like a regular Tuesday night for you."

Q. Okay. Now, does that sound to you like a hardened biker outlaw that is saying those things to my client?

A. I've read hundreds of text messages, and they talk funny, they talk like they're attracted to each other. It's nothing strange to me on how they sometimes kind of almost, it would appear, flirt with each other. But --

Q. Well, let me ask you a question on that. You guys have possession of the phone. Correct?

A. His phone, yes, sir.

Q. Did you run down the actual phone number associated with Mexican Bear?

A. I need to see if I have Mexican Bear in the contacts. Because like, that's one of those chat applications. I know we had a Mexican Bear saved. I know in the phone report that's done, we typically look at the contacts, and then if it says Mexican Bear, and there's a number associated with it, then we do what we can to see if we can attribute it to him. So I would need to see that, because I just don't remember.

Q. I understand. Would it be equally possible this is just -- he put a name into a girl he's talking to, and (indiscernible) the last one.

A. I don't -- I don't see him using Mexican Bear for that, because Mexican Bear is a real Bandito, and I think he would make up another name.

Q. Not that I have any experience of this, but it

would be possible a person would, like, I don't know, change it so his wife wouldn't figure it out?

A. I don't know if you'd pick Mexican Bear. I'm not sure, sir.

Q. All right. Moving on. Now, these particular cases, we mentioned earlier, and I think I showed you that one giant -- Yeah, thank you so much. I don't (indiscernible)

A. Thank you.

Q. You know, hold on to it for a minute.

A. Okay. Just in case.

Q. Just in case. All right. So I originally showed you all of those filings in Government's Exhibit 2, there was over 600 filings that the State of Texas did. Is that right?

A. Yes, sir.

Q. All right. In those filings, they actually heavily litigated, there was a lot of subpoenas, motions, and everything else like that. However, I'm going to show you State's -- or Defense's 12, 14, and 16.

MR. WAKEFIELD: And I'm remarking them, so these will be admitted as well, Judge.

BY OFFICER LYONS:

Q. All right. Correct me if I'm wrong, but these are the actual dismissals the State filed in May of last year for all three of these cases.

A. Yes, sir.

Q. Now, if you notice in the top right, in the right column, you'll see a checkbox, and it says the reason, and it says "Missing witness."

A. Yes, sir.

Q. Now, as we already identified, there's only one person who actually identifies my client associated with all these cases. Correct? KC.

A. Yes, sir.

Q. That's the missing witness. Right?

A. He was at the time.

Q. All right. Now, here is my question to you. Th Government, the State of Texas has the ability to go and get witnesses from anywhere in the country. Right?

A. I'm not sure, sir, if they pay for that or not.

Q. Would it surprise you to find out the State of Texas is happy to pay on a murder charge to go and pull someone from another state?

A. It wouldn't surprise me, no, sir.

Q. And certainly that that person can then be brought here to Texas to testify.

A. Yes, sir.

Q. And in the murder case, among all other ones, that is definitely one that you're going to see the State of Texas going to do. Right? Because murders are super important.

A. Yes, sir.
Q. But in this case, on a murder, they still ended up dismissing it because that one witness wouldn't show up for court. Does that sound right?
A. That's not entirely true.
Q. That's what it says in the dismissal paper. Correct?
A. It just says missing witness.
Q. All right. My point is, though, that you don't dismiss a murder charge because you just are -- for funsies. You do it because there's a real reason. Right?
A. Yes, sir, but there's more to that.
Q. Now, this case was dismissed in May. Is that correct?
A. Of '24, yes, sir.
Q. 2024.
A. Yes, sir.
Q. That was 10 months ago. Right?
A. Yes, sir.
Q. Now, in the interim 10 months, my client picked up no new law violations. Correct?
A. Until his arrest.
Q. Well, we'll get there.
A. Yes, sir.
Q. He picked up no new law violations. Correct?

A. I don't believe so.
Q. No times that he was arrested for anything?
A. I don't believe so.
Q. The one time you had contact with him was I think in June, and that month he was in his car with both Mr. Pfeffer and Mr. Rickenbacker. Correct?
A. July, the 31st.
Q. It was July. That's the one.
A. Yes, sir. Yes, sir.
Q. And when you found there, no gun was on him, was it?
A. No, sir.
Q. No drugs?
A. No, no, sir.
Q. He wasn't actually arrested for anything that day.
A. No, sir.
Q. So therefore, in all those 10 months, again, we get to the arrest date, no new law violations, no nothing?
A. No, sir.
Q. All right. Now, you also mentioned the whole thing about him getting injured. Correct?
A. Yes, sir.
Q. That happened to him in September, when he was injured and he lost his right leg.

A. Yes, sir.
Q. Or portions of his right leg.
A. Yes, sir.
Q. All right. Now, going back to his criminal history, you're aware that he only has one prior arrest in the State of Texas before these cases. Correct?
A. If it says so, sir, I won't dispute that.
Q. That one prior arrest was for an assault that was back in 2014.
A. Okay. Yes, sir.
Q. Now, you've been a law enforcement long enough to know that if you give a deferred adjudication on a misdemeanor that lasts two years long, and then it is ultimately granted and that case is dismissed, that means you completed the deferred adjudication. Correct?
A. Yes, sir.
Q. That means you followed all the conditions of probation to successfully complete. Right?
A. Yes, sir.
Q. And if people violate conditions, then they can't complete it. They get revoked, and they get sent to jail. Right?
A. Yes, sir.
Q. And in this case, our client never went to jail, was never convicted of an assault, he was actually granted the

deferred adjudication. Does that sound right?

A. Yes, sir.

Q. Other thing, too, is that there was one prior arrest, and I know you don't know too much about it, but I'll just ask you about it. There was a case that, I think it was out of State, and it was called deferred prosecution. Have you ever heard of deferred prosecution before?

A. I can't say I have.

Q. A pretrial intervention is a lot of times what you see in the State of Texas. Is that something where you actually are not asked to plead guilty, they just decide to, as long as you don't get in trouble again, we'll dismiss the case? Have you ever heard of that kind of thing?

A. I think I've heard of similar things, yes, sir.

Q. All right. Now, we're going to kind of get to a couple more things with the Banditos. And I'm trying not to belabor it. You were talking about patches, the Expect No Mercy, 1%, all that stuff.

A. Yes, sir.

Q. My client has a cut. There's no 1% on it. Correct?

A. There's no 1%?

Q. Correct.

A. I believe he's got a 1%.

Q. Does he? I don't think so.

MR. WAKEFIELD: Where's the picture of his cut? (indiscernible)

BY MR. WAKEFIELD:

Q. Well, he definitely doesn't have Expect No Mercy. Correct?

A. He never had an Expect No Mercy, he just had the ring. But all Banditos will have a 1%.

Q. Oh, do they?

MR. WAKEFIELD: (indiscernible)

MS. BOWEN: There's the T-shirts.

MR. WAKEFIELD: Okay, never mind. Yeah, I'm good.

BY MR. WAKEFIELD:

Q. All right. But he does not have --

MS. BOWEN: (indiscernible)

MR. WAKEFIELD: No, I got it. I got it.

BY MR. WAKEFIELD:

Q. But we -- But he did not ever have the Expect No Mercy patch. Right?

A. The patch, no, sir.

Q. Now, you mentioned earlier that, you know, patches are granted, usually, you said, sometimes there's like a violent episode that happens, and then afterwards they'll see the patch. Correct?

A. Yes, sir.

Q. Now, this murder actually took place, and this

aggravated assault took place in 2021. Is that right?
A. Yes, sir.
Q. Now, all that time, no patch for Mr. Vargas. Correct?
A. He was put on a disassociation where he couldn't wear his cut.
Q. No patch was found on Mr. Vargas during that time. Correct?
A. No, sir.
Q. After the case was dismissed, which was in May of last year, now he's no longer on bond. Correct?
A. Mm-hmm.
Q. But yet, in 10 months since, when you arrested him two weeks ago, no patch. Right?
A. No patch. I think they got onto us.
Q. Well, we would call that speculation. But my question is no patch. Correct?
A. No, sir.
Q. All right. Now, one of the things in the videos you showed, you showed a video on Wednesday, and there was in those little videos you were showing, I think they were from Snapchats -- Is that right? They were short, little short videos?
A. Yes -- yeah, on who? On which Defendant?
Q. It was on Pfeffer.

A. Yes, sir.

Q. Okay. My client was visible in one of those, and you said you thought it was from 2022.

A. Yes, sir.

Q. Isn't it correct that it's actually 2024, after my client was off bond, when that picture was taken?

A. Yeah, I'm not sure. If I misquoted the date, that's on me. I'm just trying to remember when that -- And I'm not sure if it was saved in the file or not, or which event it was at.

Q. All right. Last point about the Banditos. Okay? My client right now is charged with just the event that happened on November 2nd. Correct?

A. Yes, sir.

Q. He's not charged with conspiracy. Correct?

A. A conspiracy charge? I don't -- Other than -- I'm not sure if that's a RICO conspiracy, or what the --

Q. He's not charged with conspiracy.

Q. Okay. Yes, sir, if you say.

Q. He's not charged with racketeering. Right?

A. I --

Q. There's no charge that's specific to racketeering, other than the murder charge we're talking about.

A. I think it's murder in the aid of racketeering, though.

Q. Yeah, yeah, but he's not charged with racketeering in the aid of Banditos. Like, it's not like he's, like, the whole, like, criminal conspiracy charge that everybody else is on.

A. I'm not a --

Q. I understand. He also has nothing to do with any of the other events we've talked about today. Hawg Stop, Bimbo's, he was not present for any of those things.

A. The only thing with Bimbo's is he just had a picture of the stolen cuts on his phone. That's the only affiliation.

Q. But that can come from anywhere. Right?

A. Yes, sir.

Q. Okay. Now, let's talk about when he was arrested. Now, this is very important. When you raided his house, no -- Well, I mean, you found him in his car, no sign of any passport. Correct?

A. I don't believe. I wasn't at that scene, but I don't believe they found a passport.

Q. Surely, if they had found a passport, that would be like, look. Right?

A. I guess.

Q. Okay. And not only that, like I said before, pictures of his cut, nothing with -- You actually said that's the most recent cut that he's got. Again, the Mercy patch is

not there.

A. Not the patch. He had it on a ring.

Q. Now, the gun that was found, okay, the gun that was found on his person, that particular gun was not -- has not been connected with any client. Correct?

A. I'm not sure if the NIBIN report has come back on that yet. I know it was sent off to NIBIN, but I'm not sure if the report is back.

Q. At this time, we have no -- we have nothing to say that it's connected with any crime. Correct?

A. No, sir.

Q. And not only that, he is not a felon, is he?

A. No, sir.

Q. He's also never been convicted of a family violence case.

A. No, sir.

Q. So therefore, there's actually no legal reason he can't have a gun in his possession. Correct?

A. Unless you're in presence of a drug trafficker -- Well, I'm trying to answer your question.

Q. There's no -- Well, but what I'm saying is that you can carry a gun. If you're not a felon, we have open carry law in the State of Texas. There's no, like, you know, nothing preventing you. Obviously, we're not --

A. Yeah.

Q. -- you know, those are about the facts of the case. I'm talking about just there's no rules that say you can't carry a gun.

A. Just having the gun, no, sir.

Q. All right. Now, these drugs that you see, the drugs that you had in the pictures, one was a small baggie.

A. Yes, sir.

Q. That was way less than a gram. Correct?

A. Yes, sir.

Q. Okay. The other one was a large bag that was found in his house.

A. Yes, sir.

Q. You did no testing on that. Correct?

A. With the fentanyl threat, we're not allowed to do presumptive tests anymore. And so --

Q. Really? Would it surprise you to find out that HPD does them every day?

A. I'm not HPD.

Q. DPS does it every day.

A. I'm -- yeah.

Q. I know you're not DPS either, I'm just telling you that presumptive tests are done every day. Does that surprise you?

A. I wouldn't say they do it every day.

Q. Well, the reason I think it's important is I

think we've talked about this powder that was found in his room.

A. Mm-hmm.

Q. Okay? Have you ever heard of cascarilla?

A. What is it?

Q. Cascarilla.

A. No, sir.

Q. Okay. The Santa Muerte.

A. Santa Muerte? Yes.

Q. That's the one. Okay. Have you ever heard of a practice called cascarilla, where they take powdered eggshells, and they sprinkle them on their feet to ward off evil spirits?

A. Not once.

Q. Okay. Would it surprise you to find out that that was eggshells?

A. It looked like either cocaine or cut to me.

Q. Well, but the thing of it is if you say it's that, you didn't find any baggies at his house. Right?

A. Other than the baggie that that stuff was in.

Q. Just the little -- just the Ziplock. But there was no, like, baggies like you'd see if he was cutting drugs for something. Right? No scales.

A. You don't need baggies to cut.

Q. Well, you don't need -- no scales?

A. I don't think they found a scale, no, sir.

Q. No other sign of any kind of drug trafficking at the house. Right?

A. Just that baggie.

Q. Just the egg whites -- or the eggshells.

A. If you say they are.

Q. I'll bet you. Okay.

MR. WAKEFIELD: All right. Nothing -- Pass the witness, Judge.

THE COURT: Redirect?

REDIRECT

BY MS. BOWEN:

Q. Officer Lyons, you're aware that Mr. Vargas' State case on this murder was dismissed in 2024?

A. Yes, ma'am.

Q. And I think we talked about a number of bond conditions, and those being amended and all of that.

A. Yes, ma'am.

Q. So I'm going to hand you what's been marked as Government's Exhibit 63.

MS. BOWEN: And that's just one of the ones that you gave me that you did not admit.

MR. WAKEFIELD: Wait. Which one?

MS. BOWEN: It was Defense 8, but you didn't admit it, so I'll just --

MR. WAKEFIELD: Oh, that's fine. That's fine.

Page 111

BY MS. BOWEN:

Q. All right. Will you take a look at that, and tell us -- flip to the last page, and tell us what date that was issued?

A. The last page?

Q. Yeah, I believe that's where it is.

A. There's one at the top that's September 28th, 2022, but the one that's signed by the defendant is October 3rd, 2022.

Q. Okay. So fall of 2022. And then, can you go back to the first page of that? And there's a section that says "Additional conditions." Can you read what was added as an additional condition?

A. Do you want me to read what -- the X, or just what's underlined?

Q. Both.

A. "Defendant shall have no contact with the Prosecution's witness, the Complainants, the Victims, specifically the surviving family members of the Decedent, Michael John Zimmerman, and shall have no contact with CW2 Kevin Cicero, wounded, and CW3 Damaris Moore, wounded, and their family members, Banditos Motorcycle Club, or B*EAST Motorcycle Club."

Q. Okay. So the Defendant was supposed to stay away from Banditos members.

A. Yes, ma'am.

Q. And that's fall of 2022?

A. Yes, ma'am.

Q. The case was dismissed in 2024. Did -- Through your surveillance, did you see Mr. Vargas associating with Bandidos members in that interim timeframe?

A. Yes, ma'am.

Q. And can you just briefly tell us the situations that you saw him?

A. One instance, actually not to -- In 2023, a surveillance operation we did at The Wellhead Bar, where numerous Bandidos and Welcome to Hell members were present, David Vargas was there. At the Lone Star rally in Galveston, in late October/November '23, Mr. Vargas was there in and around all the Banditos, wearing their cuts.

Q. Okay. And was Mr. Vargas wearing anything Banditos-related?

A. I believe just a necklace.

Q. And so that happened between the time that condition was set and the time the case was dismissed?

A. Yes, ma'am.

Q. And the case was dismissed in 2024, and I think you already read it off on Defense Exhibit 14 --

MS. BOWEN: Oh, I'm sorry, Your Honor. I would move to admit Government's Exhibit 63 into evidence.

MR. WAKEFIELD: No objection, Judge.
THE COURT: Admitted.
BY MS. BOWEN:
Q. Sorry. Going back to Defense Exhibit 14. The reason the case was dismissed, as cited on the motion to dismiss form, was a missing witness.
A. Yes, ma'am.
Q. And as far as you're aware, is that witness still missing?
A. He -- No, ma'am.
THE COURT: I'm sorry, what?
OFFICER LYONS: No, no, sir.
BY MS. BOWEN:
Q. Now, talking specifically about the night of that shooting, the witness, KC, he was shot that night. Correct?
A. Yes, ma'am.
Q. And he required medical attention?
A. Yes, ma'am.
Q. But he later identified Mr. Vargas as the shooter?
A. Yes, ma'am.
Q. And how would KC have recognized Mr. Vargas?
A. The victim, KC, used to be a member of the Amigos Motorcycle Club, which is an official sanctioned support club of the Bandidos, at the same time that Mr. Vargas was a support

club member, and he knew him. They'd hung out together. They'd met.

Q. And he later did a double-blind photo lineup. Is that correct?

A. Yes, ma'am.

Q. And just briefly tell us, what is the purpose of a double-blind photo lineup?

A. Well, it's given by an officer of the law that has no knowledge of the case at all, nothing in the fight, so to speak. And then numerous photos are given, and you're basically told, and I paraphrase, I apologize, but the suspect may or may not be in here, and they're given one at a time, and you just tell them if you recognize the individual, and/or if that's the individual that, in this case, that you're trying to point out.

Q. And through that double-blind photo lineup, KC was able to identify Mr. Vargas?

A. Yes, ma'am.

Q. And now the night of Mr. Vargas's arrest, you stated you, Officer, as part of your investigation, you picked him up, or arrested him at what time?

A. They were following him around at a bar that he was meeting with John Pfeffer and Bradley Rickenbacker. Once they were done drinking at the bar, Mr. Vargas drove himself to an after-hours club, and sat in the parking lot for quite some

time, meeting with various individuals that were coming and going from his vehicle, indicative to the officers, and their training and experience, possible narcotics hand-to-hands. And then, once that was done, Mr. Vargas drove himself and left, and was pulled over on traffic, and arrested for the Federal warrant.

Q. And around what time was that?

A. 5 a.m.

Q. Okay. And I'm going to show you what's been marked as Government's Exhibit 51.

THE COURT: Real quick, who was in the vehicle when people were coming back and forth to the vehicle?

OFFICER LYONS: It was Mr. Vargas, just sitting behind the driver's side, as people were coming and going.

THE COURT: It was only him?

OFFICER LYONS: Yes, sir.

THE COURT: Okay.

BY MS. BOWEN:

Q. And now looking at Government's Exhibit 51, is that the ring that Mr. Vargas was wearing when he was arrested?

A. Yes, ma'am.

Q. And can you just tell us what's depicted on that ring?

A. It has a Bandidos -- You can't see it, but just from my recollection, it's got the Bandidos symbol, the

Bandidos, the Fat Mexican, Texas. It's basically like a cut design, but on the side is Expect No Mercy.

Q. Okay.

MS. BOWEN: I have nothing further, Your Honor.

THE COURT: Any recross?

MR. WAKEFIELD: Real quick, Judge. Judge, I also wanted to admit Government's -- or I'm sorry, State's -- one more time, come on, Wakefield, Defense V11, V13, and V15, Judge.

THE COURT: Any objection?

MS. BOWEN: No, Your Honor.

THE COURT: Admitted.

OFFICER LYONS: (indiscernible) Thank you, sir. Or who -- or yours? I'm not sure.

MR. WAKEFIELD: Yes. Well, I'm going to ask you about that real quick.

Your honor, was there any that I brought up that are not admitted? I just redacted those, Judge. I don't think there is. Did I admit Exhibits 1 and 2?

THE COURT: I have -- from you I have V, and then -- well, they're not really -- the Defense's 9, 10, 7, 9, 10 --

MR. DEGUERIN: And 3.

THE COURT: And 3.

MS. BOWEN: Do you need 1 and 2?

MR. WAKEFIELD: (indiscernible) I'll just give you

these, Judge. At this time, I would offer into evidence Defense 1 and 2 as well.

THE COURT: Any objection?

MS. BOWEN: No, Your Honor.

THE COURT: So admitted.

RECROSS

BY MR. WAKEFIELD:

Q. Going back to the ring, would it surprise you to find out that those also are on sale by Bezos himself?

A. With the Banditos on the front?

Q. Yep.

A. I -- It would surprise me.

Q. And again, just to reiterate, at no time, even with this information that you just brought out, did the Court or the DA's Office ever file to have his bond revoked. Correct?

A. They never issued anything, no, sir.

Q. All right.

MR. WAKEFIELD: No further questions, Judge.

(indiscernible) these are admitted, too, 12, 14, 16.

THE COURT CLERK: Are those V or D?

MR. WAKEFIELD: V. V.

THE COURT CLERK: V, as in Victor?

MR. WAKEFIELD: They're all Victor, yeah, because --

THE COURT CLERK: Oh, okay.

MR. WAKEFIELD: For Vargas.

THE COURT CLERK: Okay.

MR. WAKEFIELD: Sorry. I was trying to help out, and made more problems.

THE COURT: All right. No further questions?

MR. WAKEFIELD: No, Judge.

THE COURT: All right. May this witness be excused?

MS. BOWEN: Yes, Your Honor.

THE COURT: Any objection for this witness stepping down?

MR. WAKEFIELD: No, Your Honor.

MR. WILLIAMS: No, sir.

THE COURT: All right. Thank you, sir. You may step down.

Government, do you have any additional -- Well, you -- well, yeah, do you have any additional witnesses?

MS. BOWEN: No, Your Honor.

THE COURT: Does the Government rest?

MS. BOWEN: Yes.

THE COURT: All right. Defense, we'll start with Mr. Williams. Do you have any witnesses, or just a proffer?

MR. WILLIAMS: I'd like to make a proffer, Your Honor.

THE COURT: Sure.

MR. WILLIAMS: I have some documents that I have some

socials on. Can we admit them, and then just redact them after the hearing, to save time?

THE COURT: Sure.

MR. WILLIAMS: And then just some other PII besides that.

First of all, I'd like to proffer the information that's in the confidential pretrial services report.

THE COURT: I'll take notice of that.

MR. WILLIAMS: Okay. I'm not going to read it all right now.

THE COURT: Sure.

MR. WILLIAMS: I'll save it for argument. But I'm just going to proffer it, so that this gets in.

I also proffer the information from Mr. Pfeffer's wife, Brooke Taylor Bernstein-Pfeffer. She's present in the courtroom. If she was to testify, she would say that she's 31 years old, she's been with John for --

MS. BOWEN: But Your Honor, I would just -- If she's here, she can testify to what she would testify to.

THE COURT: Defense can go by proffer.

MS. BOWEN: Okay.

MR. WILLIAMS: Yeah. So she has been married to -- She and John Pfeffer met in San Diego, where he was in the Navy. They've been married for several years. They have a two-year-old son. She is willing to serve as his custodian,

she is willing to co-sign a bond, and serve as a third-party custodian. We have their passports, both his and hers. They're available to surrender here in court today, or as the Court dictates. She would also say that she would make sure that he attends court, and complies with conditions of bond. She does not work. He is the sole breadwinner of the family. He was, as contained in the PSIR report, he was employed by DirecTV, prior to that AT&T for some time, until he was laid off in January. But he has been in truck driving school up until the time of his arrest. He was scheduled to graduate this past weekend, and he probably could go back and finish.

She would further testify that there are no firearms in the home. The Government took them all when they executed the search warrant at the time of his arrest. Again, they met in San Diego in 2023. Her mother, who is disabled, also lives in the home, with them. His -- Her husband, Mr. Pfeffer, as is in the pretrial service report, is from Wisconsin. His mother is deceased, he has two half-sisters that live in Wisconsin, and his father is incarcerated in Wisconsin.

Bradley Rickenbacker, although he did live at the home, he would no longer be welcome in their home if Mr. Pfeffer is released.

As far as exhibits go, the Government has them. I have had to renumber some. I proffer, this is a set of copies for the Court I'm going to walk through. The Defense Exhibit,

and by that I mean Mr. Pfeffer, 4 is the indictment, and 5 are the conditions of release for Sean Christison, and a separate case number, showing that Mr. Christison was also charged with a 924(c) count, and yet Judge Ho found a combination of conditions of release that would meet the goals of 18 U.S.C. 3142.

Exhibits 6 and 7 are the indictment and conditions of release for Mr. Torino, and another separate case number listed on that document. He was also released on conditions deemed appropriate to satisfy the dictates of 3142 by Judge Ho, also in Halloween of last year.

Exhibit that's been renumbered as 8 were conditions of released for a Brandon Hance. Again, conditions of release were found that would be appropriate for this other Bandito. And Your Honor could take judicial notice of the other people released on bond, and the conditions of release for them in this case.

The following exhibit after that is 8, which is the order of release of the property, which Your Honor has seen was previously admitted.

I have a copy of Exhibit 9, of Mr. Pfeffer's Texas driver's license, the ID from his wellness center, and his license to concealed -- license to carry a handgun. The front and back of those has been proffered. They will need to be redacted.

Additionally, after that at 10 is his -- I believe it's a temporary commercial driver's license. It's a permit to show that he was in the process of becoming a truck driver.

After that, I believe at 11 is the proficiency training course that he undertook in 2015, and part of the training he had to do to get a CHL that is current, though I understand that once someone is charged with a crime such as this, that DPS suspends it. But it shows he's had his Texas CHL for approximately 10 years. Or not quite, but almost 10 years.

After that is a copy of his honorable discharge from active duty from the United States Navy. It shows his time of service on the USS Princeton, and where he separated in San Diego. It also has the PI. I'll have to redact it.

The following exhibit after that, at 13, is his copy of -- He is on disability. This is covered in the PSI report. He receives disability from the Navy, and that is one source of income that he has.

Following that is a letter from a colleague at his previous employment, Glenn Jackson, stating that he was -- at the time that he was let go, it was not due to performance issues but due to reduction in force, and that they relied on him, and that he was a trusted advisor, and a good employee.

Finally, there is a -- there should be a copy of medications that he takes for his -- for certain health

conditions,, including Adderall and Trazodone. And a family picture, as well.

So those are -- I believe I left that one out. Excuse me. But 17 is a copy of a holiday picture with Mr. and Mrs. Pfeffer, and their young son.

And that concludes my proffer.

THE COURT: Thank you, Mr. Williams.

MS. BOWEN: Your Honor --

THE COURT: Yes?

MS. BOWEN: If I may proffer something as well about Defendant Pfeffer's living situation, and his wife?

THE COURT: Just one second.

All right. What do you need to proffer?

MS. BOWEN: Your --

MR. WILLIAMS: Your Honor --

THE COURT: The Government can proffer, too.

MR. WILLIAMS: Well, I know, but I object, because they closed. So --

THE COURT: Well, that is true, you did close.

MS. BOWEN: We would do it on cross, Your Honor. We weren't aware that the witness wasn't going to testify. So I would just (indiscernible)

THE COURT: We're not -- I'm not going to allow it.

All right. Mr. DeGuerin, you may proceed.

MR. DEGUERIN: Yes, I have just a brief proffer, and

it's more informational to the Court, is that as the Court's aware, Mr. Rickenbacker was living with Mr. Pfeffer at the time. He has availability to have -- The proffer is that if he were called to testify, he would tell you that he has a trailer that he has availability to, and a spot in Katy. Within a few phone calls, he should be able to find a place in Katy, within the district, that he could be located.

Also, he has some ability to then also get a new -- The phone that was seized during his arrest obviously he can't have, but he has the ability to get a phone. That way, he can stay in contact with (indiscernible) in the Court.

I also want to proffer, really it's more of an update of his employment. It says in the PSR that he was an elevator mechanic, but as of until April 2024, he was working for Biggie Crane Rigging Company. That was from November 2022 to April 2024. Before that, he was working for Standard Industrial Services, as an elevator mechanic, and that was from 2021 to 2022. Before that, 2019 through 2021 at Hoist Crane Services, as an elevator mechanic. And prior to that, April '15 to August 2019, field service technician for Alma Mac Group USA. And before that, March 2014 to April 2015, he was a maintenance manager for Fast Flow Line Equipment. That's to supplement his -- He is, if you were called to testify, he would say that he is an employable elevator technician, and should be able to find employment forthwith upon release.

THE COURT: Thank you. Mr. Wakefield?

MR. WAKEFIELD: Judge, our witness was Shawn Newtson, and if she were called to testify, she would testify that she has known David Vargas for three-and-a-half years. They're common law married. David Vargas actually served two tours in Afghanistan in the United States Army, achieved the rank of E-5, or sergeant. During his service, he was awarded the Bronze Star for heroism, Purple Heart for being wounded in action, and was discharged honorably after suffering an injury from an IED explosion, to which he receives VA disability treatment currently. He's also currently treated through the VA for anxiety and PTSD due to both those combat injuries.

In this case, they had two daughters. One's name is Valley, who turned one this past Wednesday the 26th. And then, this past Friday, she was actually pregnant with their second daughter, named Dakota, and they found out the morning of this past Friday that Dakota actually died in the uterus from being strangled by the umbilical cord. And therefore, she had to give birth to a corpse on Friday. No burial proceedings have been made for Dakota at this time, but she is going to be buried, Judge.

David also has two other children that are ages 5 and 12 from previous marriages. And during the time that he was on bond for his cases, that when this was pending in the State Court, she was actually with him the entire time. During that

time, she was able to confirm that he was able to make all of his appointments, and make all of his meetings, make all of his court settings. And not only that, she was also there, and went to see that as he was going through, even though as the Prosecution mentioned, the State, that there was possible violations, she still saw as his conditions were relaxed throughout the time that he was there.

When the charges were dismissed in May, they came home, and that's when they got pregnant with their most recent daughter, Dakota. Shortly after that happened, on September 15th, he was crippled by a hit-and-run collision, where a motorcycler collided with him, and then fled from the scene. Based on those injuries, he lost his right leg at the mid-calf. And at this point, he was getting treatment at the VA, and was scheduled to have an appointment on February 20th, which was the day before he was arrested. She's been told by Dr. Camden Tissue, with LBJ, that if he does not begin physical therapy for his leg, his leg will atrophy, and he will likely require an additional amputation of parts of his leg. Since he's been in custody, he apparently has not been getting meds that are required for his leg. His leg is continuing to swell, and appears to be getting worse.

Because of his amputation, he's been out of work, but prior to his injury, he was a heavy equipment operator. And if he were able to get his prosthesis fitted, which as I

understand, or as she understands, will not be available to him until this case is concluded here in the Bureau of Prisons, if he doesn't have -- or if he has a prosthesis, he could continue with physical therapy, and go back to work.

Formerly, he did have a U.S. passport. However, that passport was stolen in a car burglary that took place earlier this year, and has since disappeared. And then, additionally, she also verifies that the baggie found at his table was, in fact, crushed eggs, that is used as cascarilla for the Santa Muerte purposes, and she knows that because she's actually the one who put it there for him to use when he gets up in the morning.

And that is our proffer, Judge.

THE COURT: All right. Thank you. Anything further from any of the Defense attorneys before we proceed to arguments?

MR. DEGUERIN: No, Your Honor.

THE COURT: Okay.

MR. WAKEFIELD: No, sir.

THE COURT: Anything further, Mr. Williams?

MR. WILLIAMS: Just -- nothing. Just argument, sir.

THE COURT: Okay. Argument, Government?

MS. BOWEN: Your Honor, would you like me to do the argument for all three Defendants?

THE COURT: Yes.

MS. BOWEN: Okay.

So Your Honor, I'll start with just the violent nature of the Banditos, and specifically the Welcome to Hell chapter, which all three of these defendants are known to be members of, and Mr. Pfeffer specifically is the president of. And Welcome to Hell, as Officer Lyons testified, is a violent chapter. It's a chapter that engages in narcotics use and trafficking. And I mean, that's evidenced as well the night of the arrest, Mr. Rickenbacker, Mr. Pfeffer, and Mr. Vargas were all together, and Mr. Vargas was conducting what officers believed to be hand-to-hand transactions, and actually had a small baggie of cocaine on him when he was arrested.

Specifically, as it relates to the violence of the Welcome to Hell chapter, and these Defendants in particular, Mr. Pfeffer, although he had not been president of the Welcome to Hell chapter at the time, he was awarded that title after The Hawg Stop incident, the video clearly shows that he approached the victim, he brought the victim over to this side area, and he engaged in the first punch, which led to all of the Banditos and the Mascareros converging on the victim, beating him up, trying to rob him of his cut, and ultimately shooting and killing him. As it relates to Bimbo's, another incident with a chapter that they invited there, they pulled them aside, and the evidence shows that 40 to 50 Banditos began beating up the Grey Beards, robbing them of their cuts. Many

of them had to seek medical attention, one of them had his arm broken. And again, the initial aggressor in that was Mr. Pfeffer. As the president of the Welcome to Hell chapter, he had other Welcome to Hell members around him, and it was very similar to The Hawg Stop. They converged, and they beat these other members up, robbed them, and that was that.

As far as Mr. Rickenbacker's involvement in The Hawg Stop, we know from the evidence that he was engaged in an assault on another B*EAST member, and actually did rob him of his soft cut.

As far as Mr. Vargas goes, that murder, the Blue Bayou murder, and I'm trying to make this brief, Your Honor, because I know I put on, you know, way too much evidence last week, Mr. Vargas has been identified as the shooter in that murder. A vehicle pulled up to three motorcycle riders, three B*EAST members, two of them were shot and thankfully survived, and one of them was killed as a result of that shooting. And Mr. Vargas has been identified as the shooter in that murder.

Now, I know we talked about Mr. Rickenbacker being present, although, you know, no evidence shows that he was actually the shooter in that May, I believe it was May 2023 incident, or I'm sorry, excuse me, May 2021. But that incident shows that the Banditos don't just plan out these attacks. They don't think, hey, a B*EAST member --

MR. DEGUERIN: Your Honor, I would object. That

incident that we're talking about is not in the indictment, and is not subject of the detention (indiscernible) based on this indictment, and that allegation is not something even alleged (indiscernible)

THE COURT: That's -- But if it's been testified to, that's something the Court can't consider under the 3142(g) factors.

MR. DEGUERIN: Thank you.

MS. BOWEN: As I was saying, Your Honor, it shows the spontaneous nature of a lot of these incidents, where if a Banditos member is out and about and they see a B*EAST member, or another rival, they have the go-ahead to go after that member, whether it's shoot them, assault them, rob them. It's a spontaneous thing. And so who's to say that, you know, that couldn't happen again, as we're -- you know, as a B*EAST member drives by, any Bandito member could go after them, including these three Defendants. And now, they're all still members of the Banditos. They're all still members of Welcome to Hell. There's plenty of Banditos members still out and about, especially in the Houston area. And really, even if these individuals are on home confinement, all they need is a phone to send a message about information they know, send a message about someone they think is a witness, send a message that, hey, we heard B*EAST members are going to be here, go get them. We've seen that Mr. Pfeffer absolutely has that pull, and so

the danger to the public would not be mitigated by these individuals being on home confinement, because again, all they need is a phone to put out these orders, and to have these incidents, you know, created.

Now, specifically with Mr. Pfeffer, the Defense talked about him getting his license to be a truck driver. Again, Your Honor, these incidents are spontaneous. What's going to happen if Mr. Pfeffer is out driving his truck, and he sees a B*EAST member? We don't know. Something dangerous could happen. And as for going back to his home with his wife, there's Bandito stuff all over his home, found all over his home. So she knew what he was up to. She knew he was in the Banditos. And despite the number of search warrants at his residence, nothing was done to keep him from reengaging in the Banditos, to keep him from continuing to order these incidents, go out with the Banditos, do, quoting him, "gang shit." And so I would posit, Your Honor, that conditions of release are not going to keep him from being a part of the Banditos, engaging in this activity, and putting the public in danger.

As it relates to Mr. Rickenbacker, Your Honor, I understand he has a trailer in Katy, but there was no mention of who would be his third-party custodian, who would ensure that he is following the rules of his conditions, who's going to ensure that he goes to court, that he's, you know, doing what he's supposed to do? And there's just no evidence of a

third-party custodian has been put forward.

And as it relates to Mr. Vargas, Your Honor, his wife was, his common law wife was with him the whole time, but she didn't stop him from hanging out with the Banditos. Being on bond from the State didn't stop him from hanging out with the Banditos. And regardless of whether he was actually violated in the Courts, we have evidence that he did violate those conditions. And despite being on bond for murder, he was still hanging out with the same individuals that he was hanging out with when that murder was committed, and that, you know, continue to commit these violent acts. And I would also posit, Your Honor, that the night of the arrest, Mr. Vargas was out until 5 a.m., and his pregnant wife was at home, very near about to give birth, and he was out doing Bandito stuff, wearing all his Banditos gear, possibly doing hand-to-hand transactions, not at home with his wife. And I do believe, Your Honor, that he can get the medical attention and the physical therapy he needs in the BOP.

I think that's it, Your Honor.

THE COURT: All right, thank you. Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

Your Honor, this is a presumption case. So I think if we look at the evidence that's here to support the presumption, we can start with the bail that's been granted to other Defendants in this case, and in the related cases, that

show that there is a combination of conditions that can be created to protect the community, and ensure the Defendant's appearance. And those conditions routinely, as you can see or take judicial notice of, include no association with other Banditos. So there are conditions available by statute, and that have already been imposed on other Defendants in this case that are sufficient.

So how do we know? First of all, the indictment, as it relates to this individual, counts 1 through 3, and 8 primarily relate to two incidents. One in September of 2020, an incident at The Hawg Stop Bar, where my client was shot. He wasn't even charged with a Class A misdemeanor assault if he punched that man for whatever reason, which we don't know because no one else was there, he was never charged with a crime for that. In fact, he was shot. And that was four-and-a-half years ago. He's such a danger to the community that the Government has set on its hands from September 26th, 2020 until February of 2025 to arrest this man for something that happened four-and-a-half years ago. And they know he wasn't involved in the murder because they did arrest somebody, Roy Gomez. And Mr. Pfeffer has never been charged with anything related to that prior to this indictment.

Similarly, the Bimbo's incident, which there's no evidence he's given any order for anybody to assault anyone. The best that Mr. Lyons could come up with at the Bimbo's was

that one person says that Pfeffer hit somebody at Bimbo's. He doesn't say whether he -- No video of it, doesn't say where he was in the melee. But we do know Mike Dunphy was there, and he was the sergeant at arms for Nationals, who was basically giving orders, not Mr. Pfeffer. Again though, that was February of 2023, two years ago. Mr. Pfeffer is such a danger to the community, the United States Government finally waited until February of 2025 to do something about him. In the interim, they've gone to his house, executed search warrants, and given him his guns back. That's what a danger to the community they thought he was. And now they want to come in here, and be schizophrenic, and tell you he's a danger to the community? There's no combination of conditions you can come up with, never mind the fact that they haven't done anything in four-and-a-half years from the first incident, and two years from the second, they're saying now there's no conditions? The past four-and-a-half years, he's been fine. They haven't picked him up. And Roy Gomez was charged with that incident four-and-a-half years ago, not Mr. Pfeffer, who was shot.

Now, the Bimbo's incident, again, there's Mr. Pfeffer -- there's only hearsay evidence. And this is important to consider, the rules of evidence don't apply in these hearings. And that's why the weight of the evidence is one of the least of important factors, because it's not subjected to the scrutiny of reliability and authenticity that we use in a

regular trial. And so the time differential alone, and what's happened during that time period rebuts the presumption. We have evidence that Mr. Pfeffer was shot, we have evidence that the feds have searched his home based on a vague threat that nobody has a picture of, but gave him his gun back.

We have evidence that during that same time period, he's had a concealed handgun license from the State of Texas, and nobody's ever moved, no evidence that anybody's ever moved to take that gun license from him. In fact, Harris County State Courts had, in that same time period, dismissed two criminal cases against him. One for obstruction for lack of probable cause, after which the judge ordered that his cut, this gang paraphernalia that's so awful, that we've seen so many pictures of, the Harris County District Court judge ordered it to be given back to him. And then, just last year, he was arrested on a gun charge on July 31st to August 1st. That case was dismissed within a week for insufficient evidence. And again, a judge ordered that this man be given his firearm back.

So we see the exact opposite of what these prosecutors say today. We see State and Federal authorities returning firearms to John Pfeffer. That's how dangerous he is. Our State and Federal Government, who can't agree on the time of day, have both agreed that he should get his guns back, and keep his guns twice in the past year. May 10th of last

year, they gave him his guns back when they executed a search warrant. And there wasn't any search warrant. They said they were there because he had threatened a witness. If he was threatening a witness, the first thing they would do is take his firearms, and they gave them back. A State Court judge a few months later gave him a firearm back. That rebuts the presumption that there's no combination of conditions. His guns are not there. They've taken his guns. Other combinations of conditions have been found for others.

He lives with his wife, his two-year-old son, and his mother-in-law. While some people may think maybe detention would be a break from your mother-in-law, that's not the case here. His mother-in-law is present, his child is present, his wife is here, and she's ready to serve as a third-party custodian. Your Honor can order home arrest, you can order intermittent confinement, you can order that you have a GPS ankle monitor. There's no allegation that he's ever jumped bond, or violated conditions of bail before in his State cases. So obviously, there is a combination of conditions that would protect the community, and secure his appearance in the Court.

He is a United States Navy veteran. He gets disability from the DA, and he's treated for some mental health issues that -- of some type, that he gets the medications for. And this is a complex case. I anticipate in the near future that we'll be moving to certified as complex. And given the

volume of discovery, it's also important that he be freely available to his attorney while he's on bond in order to review the discovery, participate, and receive the effective assistance of counsel.

But the evidence, we have presented sufficient evidence to rebut the presumption, and to show that there's a combination of conditions that will secure both his appearance in court, and protect the community.

Thank you.

THE COURT: Thank you, Mr. Williams. Mr. DeGuerin?

MR. DEGUERIN: Thank you, Judge.

I echo a lot of what Mr. Williams just talked about as far as timing goes, and I won't go over that again. But we were getting close on the 2020 year, months away from statutory limitations on counts 2 and 3. Either way, the timing is important because all allegations against Mr. Rickenbacker, or at least all indicted allegations against him are from the 2020 case, and the 2023. I asked, if you recall, Judge, I asked is there other things out there other than these three incidents, and they said, no. If you had other stuff, wouldn't you bring it? Sure. So we're talking about those three incidents. And the one that she brings up that's not in the indictment, that I objected to, I asked, wasn't he cleared of that? Yes, he was.

So we're talking about the 2020 and 2023, which is The Hawg Stop, and Bimbo's. Hawg Stop, also on cross we

learned that he wasn't a Bandito at the time. He was a Mascarero. Maybe it was somebody who was a supporter, or something like that. That's what the testimony was about the Mascareros. But there wasn't any tie specifically to Mr. Pfeffer, to the person who was the victim, or any of that other group. The only evidence is that he was there, and that they said that he robbed (indiscernible) Rob, I understand, because we're lawyers, we understand what robbery means, by taking something by force. But what we're talking about in all these incidents is we're talking about people taking somebody's flag, or their jacket, or their sweater, you know? It's like, I understand that the assaults and the robberies are serious, and it's been something that people have, on both sides, have lost loved ones and friends.

But when it comes down to Mr. Rickenbacker himself, there hasn't been an allegation that he shot anybody, or that he was involved in any shooting. What they're alleging was on The Hawg Stop is that he stopped another B*EAST member from helping a friend, which is keeping somebody out of a fight, and then saying that after that, he took his sweater. That's what The Hawg Stop allegations are. The Bimbo's, there's no indication that -- when they were showing the video, no one identified Mr. Rickenbacker as being part of that melee. And so really, the strength of the evidence is you have Mr. Rickenbacker being in two places.

I do take somewhat note that so much of what is being argued here is the association with -- I think the Court said you can't associate with somebody. That's just an association. You can't associate with Christians, you can't associate with Texans, you can't associate with Banditos, that borderlines on getting on someone's association. What you can say is you say you can't associate with somebody who's engaged -- that may be a witness, or may be associated with these things. Even that said, we'd be willing to say we will keep those, if the Court were to order Mr. Rickenbacker to keep distance from the people in the indictment, witnesses, alleged witnesses or potential witnesses, that's fine. And even so, disassociation from the Banditos for the period of time of the indictment, we would accept that. Even though I think that there are some issues with those type of rulings, we would accept that.

I understand, Judge, if I were you, sitting here, about Mr. Rickenbacker, first off, I think the presumption's been busted. I asked specifically, is he a flight risk? No, he's not. Flight risk, that's gone. That presumption is gone. The only evidence that's been presented, which is the testimony of the officer, is that he's not a flight risk. So then we come down to is there a danger to the community? I echo what Mr. Williams said, is that other people in this case, charged with the exact same counts as Mr. Rickenbacker, Mister (indiscernible) and Mr. Cox, they're both charged in -- Well,

Mister (indiscernible) is charged in count 1, and Mr. Cox is charged with count 2 and 3. Mr. Rickenbacker is count 1, and counts 2 and 3, and he's been placed on bond. So there's been -- there are conditions of bond that can be set to ensure that these guys will show up, not to be a danger to the community, and appear in court.

Mr. Rickenbacker, as the Court knows from testimony, but also from the pretrial report, was in the Navy. After that, he took his -- he was an engineer in the Navy. He learned how to work on mechanics, and became an elevator mechanic here in Texas. He has two children that live in the jurisdiction. He is not a flight risk. I was going to say I can understand the Court's concern about having a place to be, and where would you say this is the address you have to be? Because, right, currently, on the arrest, he was living with Mr. Pfeffer, and all of his worldly possessions are with Mr. Pfeffer. If we get to the point where the Court would feel comfortable with setting a bond, then we'll get a more specific date. I just -- It's a catch 22. To find a place to live, you have to be out. To get out, you have to have a place to live. Mr. Rickenbacker's family is all in Las Vegas and North Dakota, other than the children that he has here, in this jurisdiction.

I would ask the Court to set a bond with GPS monitoring, and that would allow to know exactly where he is, allow him to work. I echo Mr. Williams' thing that -- argument

that this is going to be complex. This case could take two or three years of pretrial to get to a trial. When there is no -- In the Bail Reform Act, there is not a specific amount of time that we assume that there is going to be a detention. They don't have that, they don't have, they never -- Congress didn't put it in there, but we do in the Speedy Trial Act know that they expect people to be tried within 70 days. So pretrial detention is never supposed to be more than 70 days, according to Congress. However, in these cases with multiple defendants, with since 2019 discovery, it's going to take a long time to get to a resolution. And that weighs in the favor of release, especially when it's an allegation that's two or four years old.

So I'd ask the Court to set bonds for Mr. Rickenbacker. And if we need to, we can follow up with finding a specific address that he can be released to.

THE COURT: Mr. Wakefield?

MR. WAKEFIELD: Judge, before I begin, I do want to correct one thing. I had mentioned earlier that you could find that ring on Amazon. It's actually on eBay where you can find it, not Amazon. And I was just informed of my mistake, Judge, just to let you know.

All right. One of the things with my client that separates him from a lot of the other people in this particular case is he already has been charged with these offenses, had

bond conditions, and lived for 30 months with those bond conditions on him. I know that this particular case is different because it's a Federal case, but it's the same -- life was on the table in the State case, it is on the table here as well, Judge. And the fact that he actually was not only granted bond originally, and given GPS with home confinement, but that slowly but surely, it was relaxed throughout the time that he was on bond, shows that he has a great conduct, a great record, a proven track record of showing up to court, of not committing new law violations. And I realize the Government brought up sometimes that he was seen nearby other Bandito members. But guess what? That wasn't credible enough for the State to do anything about it. And in a murder case, you know that they would have. But over 600 filings that were done by the State in that case, not one of them was to revoke his bond, or to change his bond conditions. The only actual applications that were made were to reduce his bond conditions. And each time that was done, the Government granted -- or I'm sorry, the judge granted it.

The conditions that he was on there clearly were enough to keep him coming to court. And quite frankly, Judge, you heard, the evidence hasn't changed since that case. Their case is based on one witness' testimony, one witness' identification, and a ping, and that's it. Based on the fact that the evidence is exactly the same as it was before, and

that case was dismissed on the State side shows you, in my opinion, the reason I brought that up is because it shows you that there is -- It's going to be a difficult case for the Government to prove. And that, I think, is important for the fact of one of -- part of your calculus is the likelihood of conviction in this case, Judge.

Now, I believe that the proffer that I had talked about earlier, that indicated that all of the things that are going on in his life, that he was a war hero, that he is the sole provider for that family, that he has been terribly injured -- Now, I will tell you this, Judge, is that he cannot get the treatment for his leg. He's been informed that he cannot get the treatment for his leg until he's convicted, not while he is in there on pretrial detention. Which means if this case takes years, as it sounds like, this leg is going to be either amputated even further, or it will cause him serious disfigurement otherwise.

THE COURT: How do you know he can't get treatment?

MR. WAKEFIELD: I've been told --

THE COURT: I mean, they have medical facilities that they do at Corley, and they have medical facilities at -- I mean at FTC.

MR. WAKEFIELD: My client has informed me that he was informed by the doctor at the FTC that he cannot get treatment for his leg, physical therapy.

THE COURT: Do you have anything -- do you have any proof of that?

MR. WAKEFIELD: I do not. Just (indiscernible)

THE COURT: Do you have any records, any medical records that he was seen by a doctor, that he cannot get treatment?

MR. WAKEFIELD: No, Your Honor. I don't have any for this Court, Judge.

THE COURT: Okay. Then why are you even making that representation? There are plenty of people who go through the system here and get treated, you know, when they're in pre-trial detention.

MR. WAKEFIELD: I'll withdraw the argument until I find evidence, Judge.

THE COURT: All right. Go ahead.

MR. WAKEFIELD: And in addition to that, Your Honor, there was a delay in filing these charges. This client was on bond for 30 months. When the case was dismissed, it took another 10 months that the Government did not file charges. During that time, my client was charged with no new law violations, was also charged -- The only time they ever saw him, he was with the co-defendants, but he didn't actually have any weapon on him, he was not connected to any crimes. There is no history of flight, there is no history of evasion.

Now, as far as his gang affiliation, the Government

brought up that all you need is a phone. Actually in the evidence, it said that my client has no official position within the Banditos, that he was a member, but he was not a member with any leadership. He's not a person who has any evidence that he has ordered any kind of a hit on anybody, or anything like that, or ordered any action like that.

The last thing I'll say, Judge, is that this particular case obviously has taken an enormous toll on his family. I really do ask that this, at least in this case, I think that, as both Counsels have said, there are conditions that can ensure his -- safety of the community, as well as his risk of flight. But not only that, Judge, offering this man an opportunity to bury his child, I mean, I think that would be something that would be worth -- everybody would have a lot of good from that. And I do believe, Judge, that based on his track record that has proven that he's made it to court, and he has not committed any new law violations while on bond or even after, I believe that the right thing to do is to give him a GPS bond, like was mentioned before. GPS can be under home confinement to begin with, absolutely, and then we go from there, Judge.

THE COURT: All right. Thank you. The Court is going to take a break. We will be back at noon, and give everyone a quick break, and then I will announce my decisions.

(Brief recess.)

(Back on the record.)

THE COURT: Thank you. You can be seated.

All right. The Court has reached a decision in each of these cases, and it's going to start with Mr. John Pfeffer, Defendant number 1, criminal number 24-CR-543. The Government has requested that you be detained based upon a presumption, as well as F(2)(e,) I believe, where it says a serious risk to such a person will obstruct, or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness or juror.

Now with the presumption, a presumption means that there is a rebuttable presumption that there are no condition, or combination of conditions that will reasonably assure the appearance of the person as required, and the safety of the community. Evidence must be produced to rebut both presumption under flight and danger. In a presumption case, the burden shifts to the Defendant to produce only rebutting evidence, but the burden of persuasion remains with the Prosecutor. If the Defendant presents evidence tending to rebut the presumption, the presumption still remains as a factor to be considered. If there's insufficient evidence to rebut the presumption, the Court still must consider the 3142(g) factors along with the presumption. If there is no evidence at all to rebut the presumption, then you're detained. The mere production of evidence does not completely rebut the presumption.

Those are the parameters that the Court is operating under. With respect to Mr. Pfeffer, the Court finds that the presumption has been rebutted with respect to risk of flight. The Court finds that the Defendant presented some evidence tending to rebut the presumption, but the Court still considers the presumption as a factor to be considered under 3142(g) factors of 18 U.S. Code. After considering the evidence and testimony, including the pretrial report, weighing the presumption, along with the 3142(g) factors, the Court finds that there are no condition, or combination of conditions to reasonably assure the safety of the person or community with respect to Mr. Pfeffer.

Mr. Pfeffer, you are the leader of the Bandidos Welcome to Hell Chapter. In this chapter, according to the evidence and testimony that the Court has heard, these patches mean something. What you're wearing means something within that gang. You have a member of the Safari Team, which is you're hunting rival gang members, where there is this ongoing order to hunt down and hurt, and in this case kill other rival gang members. And not only does this order go out that these gang members seek to enforce, they make a show of it by putting on these patches.

In September of 2020, a B*EAST member was shot and killed at this fight at The Hawg Stop Bar. You met with this person, you punched him, you started the incident. You tried

to steal his cut, you got shot, you ran off, and later you were found in the hospital with a gunshot, as well as a clip with rounds of ammunition that was part of your property, and gun residue on your clothes. In addition, in the Bimbo's, in 2023 -- So this is not just one incident in 2020. In 2023 you get into a fight with the Grey Beards, you're identified by witnesses as being involved, you're identified from surveillance videos, and cell tower information. The victim in that case was severely injured, concussions, staples, and lacerations.

And then on July 31, 2024, you were in a vehicle with Mr. Rickenbacker and Mr. Vargas, and a prospect, where you appear to be dealing drugs, and you're found with a gun, as well as other people who have guns in that vehicle, and drugs. In addition, you tossed your phones into a field. I believe that was when you attempted to destroy evidence by discarding mobile devices into a body of water, according to the pretrial report, you and Mr. Rickenbacker. I believe that was in relation to the search warrant. You also -- There's evidence that you made a threat, and the victim fears for their life.

Given that, and your -- And I know that you were also arrested. I know the charges were dismissed, but you have an obstruction of retaliation arrest in 2019, obstruct police officer arrest, it looks like a misdemeanor in 2015, that was -- I don't know what happened to that. And in 2024, it was

dismissed, but unlawful possession of a firearm. Taking all these into consideration, the Court finds that there are no condition, or combination conditions to ensure the safety of the community if you are released on bond. Therefore, sir, you will be detained pending trial in this case. I will issue an order laying out all the reasons I just gave, I'll issue a written order after today's hearing. So Mr. Pfeffer, you are remanded into the custody of the Marshals. Marshals, you may take him away.

Now with respect to Mr. Rickenbacker, the same parameters apply with this that the Court is operating under. The Court finds that there was some evidence to rebut the presumption of risk of flight, and danger to the community, but it was insufficient evidence, so the Court considers the 3142(g) factors in connection, or in addition to the presumption. The Court notes again you attempted to destroy evidence by getting rid of your cell phone. You also -- were involved in The Hawg Stop fight. You were also involved, in May 2021, in the strip club incident, where a B*EAST member drove by, and you had a gun on you. You were in the area. Although your gun was not the one that was fired, you were driving in the car, in approximation near where the B*EAST member was shot and killed. You were also at the fight in Bimbo's in 2023, the fight with the Grey Beards, according to cell tower records, and there was a picture of the stolen cuts

from the Grey Beards next to your motorcycle. July 31st, 2024, you were found with a gun in the car, along with Mr. Pfeffer and Mr. Vargas, where people were going back and forth, and it looked like you were all engaging in drug dealing.

You also have no place to live, your employment is spotty, you have no third-party custodian, you have a history -- you've been arrested for unlawful carrying of a weapon, possession of marijuana. Those charges were dismissed. As well as unlawful possession of a firearm in 2024, your charges were dismissed as well, but the Court notes that those arrests were there. You are unable to provide any contact information for collateral sources. Attempts to verify your information remain unverified. Attempts to contact your emergency contacts proved unsuccessful. You owe $15,000 in child support. There is a history of some marijuana and alcohol use. And again, you are a member of the Welcome to Health chapter, and as actually a ranking member of that chapter, a very violent chapter in the Bandidos organization.

For all those reasons, the Court finds that there is no condition or combination of conditions that will reasonably assure your appearance, and the safety of the community as required. Therefore, sir, you are going to be remanded into custody pending trial in this case. You are excused.

Now with respect to Mr. Vargas, again the Court is operating under the same parameters. The Court finds that

there was some evidence to rebut the presumption. The Court finds the presumption's been rebutted with respect to risk of flight, but not with respect to danger to the community. So the Court considers that presumption, along with the 3142(g) factors, and notes that you were involved in November 2021 in this Blue Bayou Café, where B*EAST members were shot -- or two were injured, and one was shot and killed. You were identified as a person in the vehicle. Phone records put you in the vicinity of the shooting. Also, there's pictures of the victim on your chat summaries. You got a G-Unit badge shortly after this incident where this person was killed.

Exhibit 20 shows -- talks about you taking cuts, and you wanted to continue to use cocaine.

Despite the evidence presented by your attorney, arguing that the Court never found you violated bond conditions, it was clearly, you were seen in surveillance, associating with other gang members, which was a violation of your bond conditions at that time. And the Court does note that that was not presented by your attorney when he was making the argument that the State Courts never found any bond condition violations. The Government produced the bond conditions where you were not supposed to be associating with gang members, and you were.

On July 31st, 2024, you were in the vehicle, apparently dealing drugs in the cars, with other people coming

and going, where there were drugs found in the car, as well as other people with guns. And then September 19th, 2025, when you were arrested early in the morning, there was a powder, I believe a baggie in your wallet, and you had a gun in your vehicle, you had that Expect No Mercy ring. You also have a history of drug use, marijuana, cocaine. You have a conviction for assault in 2014, a deferred prosecution for DWI in 2012, although then the murder charge, which is related to this charge, was dismissed in 2021, I believe because of this case.

Given the extent of the amount of violence involved in multiple incidents in this investigation, The Court finds that there are no condition, or combination of conditions to keep the community safe, as required. Therefore, Mr. Vargas, you will be detained pending trial in this case as well. Again, I'll issue a written order on all three Defendants, but at this time, you remain in custody.

Anything further from anybody?

MS. BOWEN: Nothing from the Government, Your Honor.

MR. WAKEFIELD: Judge, we just need to -- If we may, if someone has a Sharpie, we can redact some PII from some of the exhibits (indiscernible)

THE COURT: I am going to hand back the exhibits.

MR. WAKEFIELD: Or you -- Okay. That's fine.

THE COURT: Because I don't want to keep those, so you all keep them.

MR. WAKEFIELD: Perfect.

THE COURT: The record is what it is. So I'm just going to give you all the exhibits. If you all can go through them, this is what I have, and just take out what was produced by everybody.

MR. WAKEFIELD: (indiscernible) Thank you.

(Hearing adjourned at 12:14 PM)

C E R T I F I C A T I O N

I, Lindsay Peacock, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.



Lindsay Peacock

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: March 10, 2025