UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

****************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA | 4:24-cr-00543-3 |
| VS. | HOUSTON, TEXAS |
| DARVI HINOJOSA | FEBRUARY 10, 2026 |

****************************************************************

TRANSCRIPT OF MOTION HEARING
HEARD BEFORE THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

****************************************************************

APPEARANCES:

FOR THE GOVERNMENT:
Mr. Byron Black
Ms. Kelly Zenon-Matos
U.S. Attorney's Office
1000 Louisiana St., Suite 2300
Houston, Texas 77002

FOR THE DEFENDANT:
Mr. Charles Thomas Flood
Flood & Flood
914 Preston Street, Suite 800
Houston, Texas 77002

Official Court Reporter:
David S. Smith, CSR, RPR, CRR
Official Court Reporter
United States District Court
Southern District of Texas
515 Rusk Street, Room 8004
Houston, Texas 77002
david.smith@txs.uscourts.gov

Proceedings recorded by mechanical stenography, transcript produced via computer.

**P R O C E E D I N G S**

THE COURT: Let's turn to *United States versus Hinojosa*.

MR. BLACK: Good morning, Your Honor. Byron Black and AUSA Kelly Zenon-Matos for the government.

MR. FLOOD: Good morning, Your Honor, Charles Flood for Mr. Hinojosa.

THE COURT: Welcome, Mr. Hinojosa.

THE WITNESS: Hello, sir.

THE COURT: You do not need interpretation of any sort, do you?

THE WITNESS: No, sir.

THE COURT: Okay. We're here on a motion to revoke the detention order. Do you want to go first on that, Mr. Flood?

MR. FLOOD: Sure, Your Honor.

I filed a motion seeking this Court to review Magistrate Ho's detention order based on the finding of some new evidence, Your Honor.

THE COURT: The substance tested was not cocaine, right?

MR. FLOOD: That's correct, Your Honor. And they made a lot of hay out of that at the previous hearing and Judge Ho made a lot of hay of it in her order and I think that it is important for this Court to reconsider, Judge, based on that, because the notion that he was in violation of this bond based

on the substance was a key part of her order and a key part of their presentation and it just wasn't true, Your Honor.

THE COURT: Shouldn't you have approached Judge Ho about this in the first instance?

MR. FLOOD: No, Your Honor. Under 3142 I'm supposed to ask the District Court to review that.

THE COURT: Mr. Black?

MR. BLACK: Your Honor, I know the Court's read our written response.

THE COURT: Yes, I did.

MR. BLACK: Our position is that while this was part of Judge Ho's analysis, it was not central to the analysis; and certainly there was adequate basis independent of that for detention. I know Judge Ho did a very good job in her detention order laying out her reasoning and you can see that the core of her reasoning was really the violence that the defendant allegedly engaged in and that is what drove her decision to detain the defendant.

So the government is prepared, if the Court would like, to put on de novo evidence again if the Court is inclined; but certainly our position is that this was a small part of the Court's decision and would not have changed the calculus when the Court decided to order the defendant detained pending trial.

THE COURT: Is gang membership admitted or denied?

MR. FLOOD: It's admitted, Your Honor.

THE COURT: This is of course much -- the alleged conduct is much worse than we normally see on detention orders. Directing shootings, trafficking controlled substances. The lidocaine that was falsely determined to be cocaine is not the only involvement he's had with drug trafficking, is it?

MR. FLOOD: Well, Your Honor, the involvement -- to be clear, the involvement in drug trafficking in this case is so far below what you would generally see. There's 53 grams of cocaine alleged to have been trafficked in this case; and both of those underlie the state charges, which both get dismissed and get lapped up by the federal charges. So the drug trafficking in and of itself, frankly, you know, while it's not a nonissue obviously, based on the amounts, they would be so far below what these courts see in federal court that I think they would be easily bondable, Your Honor.

The tougher question and the one the Court should be in and rightfully wrestling with is the notion of danger, the allegations that somehow he directed the activities of others; and, frankly, the evidence of that is fairly thin, Your Honor.

THE COURT: It's set for trial in May, right? It's the same case.

MR. BLACK: It is.

THE COURT: He's currently in lockup. What conditions

would you propose for a relaxation of that order?

MR. FLOOD: I would propose an ankle monitor, I would propose home confinement, I would propose there are literally hundreds of conditions this Court could impose. Obviously he cannot be a member of this organization. He cannot join in any activities with anybody in this organization. I believe the evidence would be that most of the people in this organization are locked up anyway. So he maintains employment, he keeps an ankle monitor on, and he complies with all rules of this Court, all rules of pretrial services; and in terms of his danger and his flight risk, Judge, he's been locked up for 15 months. Everyone he knew in this organization has been locked up for 15 months. He's not a continuing threat. To the extent he was a threat at one point because he could ask someone to do something over the telephone, which would be their allegation, that threat is mitigated and gone, Judge. He doesn't have that connection anymore. So I think in terms of flight risk, he has no prior criminal history. He has a long history in Harris County. He can be out, he can help me prepare for trial. There's no real reason, there's no continuing threat, like I said, and there's no risk of flight, Judge.

THE COURT: Does he have criminal history besides this offense?

MR. FLOOD: No, Your Honor. The two charges that morphed into this offense, both were dismissed; and those were

the criminal history, Judge.

MR. BLACK: And to speak, I guess, regarding the gang membership, so to clear the record, I've become very familiar with the Bandidos as part of this case. The Bandidos are not all arrested. They are not all in custody in this case. It is a large international organization. It's an organization that has thousands of members throughout the United States. We have not indicted every member of the Bandidos in this case. There are others out still and there are others who could still carry out orders if given those orders if the defendant is in the community.

MR. FLOOD: And I just don't think there's any evidence that he would have any authority over any of those people that -- the branch of this organization that he was on has been cut off, Judge.

THE COURT: Would he not be able to communicate messages even from lockup? Wouldn't he be able to tell another member of the gang who tells another member of the gang who tells another member of the gang and get word to whomever he's trying to get word to?

MR. BLACK: Certainly he can attempt to do so. There are more barriers to issuing those orders when one is in custody versus in the community, however. Jail communications are monitored and recorded. If he wants to go another avenue, that's more difficult. It is the best way that we have to

ensure community safety. It's not perfect, but it is better and does more to ensure community safety than free access in the community, or at least less restricted access in the community. Certainly if the Court is considering or inclined to grant the defendant bond, the government would ask to put on permission to put on its evidence in this case.

THE COURT: Okay. Let's do that. Let's put on evidence.

MR. BLACK: Okay. The government calls Task Force Officer Joshua Lyons.

THE COURT: Thank you, sir. If you could, approach. We'll have you in that seat nearest me.

(The oath was administered.)

THE COURT: Please try to make yourself comfortable and speak directly into the mic.

THE WITNESS: Thank you, sir.

**TASK FORCE OFFICER JOSHUA LYONS**,

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. BLACK:**

Q. First of all, TFO, could you please state and spell your name?

A. My name is Joshua Lyons, J-o-s-h-u-a L-y-o-n-s.

Q. And I'm aware that you are a Task Force Officer with the Federal Bureau of Investigation. Is that correct?

A. Yes, sir.
Q. And also you have a home agency as well?
A. Yes, sir.
Q. Can you tell us about your home agency and your career in law enforcement?
A. I'm a lieutenant with the Texas Board of Criminal Justice's Office of the Inspector General. I've been in law enforcement since 2007, have been assigned as a Task Force Officer to the FBI Houston Safe Streets Gang Task Force since approximately 2010; so that's about 15 to 16 years.
Q. Now, during your time with law enforcement you have already investigated a number of criminal organizations; is that correct?
A. Yes, sir.
Q. Can you just give us a short idea of which organizations that you have looked into and investigated in the past?
A. As a Safe Streets Gang Task Force we've investigated several, you know, either street gangs or a combination of street/prison gangs including Arian Brotherhood of Texas, Texas Mexican Mafia, Houston Tango Blast, Texas Syndicate --
THE COURT: Slow down. Slow down. I know you know the subject well. I know you know the subject well, but I've got to keep up with it and the court reporter has got to get every word.
THE WITNESS: My apologies, sir.

THE COURT: Please repeat the list.

A. Gangs such as the Arian Brotherhood of Texas; Texas Mexican Mafia; Texas Syndicate; Houston Tango Blast; and, more recently, the Bandidos Outlaw Motorcycle Gang.

**BY MR. BLACK:**

Q. So we're here today to talk about the defendant, Mr. Hinojosa, and the Bandidos. I think this is this Court's first time really diving into the Bandidos. We're not going to try the case today, but can you give the Court kind of a short thumbnail sketch of what the Bandidos are?

A. The Bandidos are a -- are considered an outlaw motorcycle gang. A 1% diamond is what they wear, is what outlaw motorcycle gangs wear. They were formed and created here in Texas, have since spread not just across the nation, but internationally. They have a paramilitary rank structure, a set of bylaws.

Q. When you say they're an outlaw motorcycle gang and they have this 1% diamond, what does that connote or denote?

A. Several years ago when a lot of these outlaw motorcycle gangs formed -- and I just paraphrase it -- the American Motorcycle Association came out and said, "Well, don't be afraid. 99 percent of those that ride motorcycles are law-abiding citizens."

So then the other 1 percent kind of took pride in that saying, "We are the outlaws. We're the 1 percent outlaw

lawbreakers."
Q. So the Bandidos self-identify as part of the 1 percent who do not abide by the law?
A. Yes, sir.
Q. Based upon your training, experience and your familiarity with this investigation, do the Bandidos engage in any criminal activity?
A. Yes, sir.
Q. What sort of criminal activities?
A. Throughout our investigations we have investigated murders, shootings, aggravated assaults, robberies, aggravated robberies, narcotics trafficking, firearms trafficking, arson, witness tampering just to name a few.
Q. Do the Bandidos have any rivals in the area?
A. Yes, sir.
Q. Who are they?
A. More recently the rivals in the Houston area and actually considered across Texas and the nation, because these groups have spread, have been the Brothers East, or B*EAST outlaw motorcycle gang, the Homietos outlaw motorcycle gang and the Mongols outlaw motorcycle gang.
Q. Are they engaged in conflict with those groups?
A. Yes, sir.
Q. And what form does that conflict take?
A. It is violent, usually violent combat, either assaults,

robberies of cuts, which are kind of seen as trophies if you can get a cut or jersey of the other people, as they like to refer to it, and up to murder.

Q. What is a cut just for the record here?

A. A cut is a -- either leather or jean vest or material that will have the color scheme and patches of that outlaw motorcycle gang. It clearly establishes your membership, your rank, different -- kind of your history and identify in that biker gang.

Q. So this conflict between the Bandidos and Brothers East, Homietos and others, is that conflict ongoing?

A. Yes, sir.

Q. And about how long has it been going on for?

A. Per our investigation it broke out in 2019, and it's still going.

Q. And by "still going," there's style violence between the groups?

A. Still shootings and murders, etcetera.

Q. So let's turn to the defendant here. Are you familiar with Darvi Hinojosa?

A. Yes, sir.

Q. And how are you familiar with him?

A. We were investigating the Bandidos and specifically Welcome to Hell Chapter that was formed. We identified Mr. Hinojosa as a probationary member of that chapter.

Q. Now let's actually take a step back. I should have asked about the Welcome to Hell Chapter and chapters in general.

So the Bandidos are organized in different chapters based on geographic regions. Is that fair to say?

A. Yes, sir.

Q. One of those chapters was the Welcome to Hell Chapter, correct?

A. Yes, sir.

Q. Can you tell us about that?

A. Yes, sir. The Bandidos, again, formed and created in Houston, have a large presence in Houston; and, you know, once you have a lot of members, you form different chapters geographically. Like here in the Houston area there were upwards of 17 chapters, for example, Conroe, Splendora, Galveston, North Houston, South Houston, Cloverleaf neighborhood. So they had created a new chapter primarily based in the Katy area that -- and this was October of 2021; and when they were created the decision was made to call themselves the Welcome to Hell Chapter.

Q. Did this chapter develop a reputation?

A. Yes, sir.

Q. Are you familiar with that reputation?

A. Yes, sir.

Q. Can you tell us about that?

A. The whole reason of the formation was to basically -- per

the name is kind of give off that vibe to Bandidos rivals like "Welcome to hell, and our whole purpose is to find you and to attack you and run you out of Houston."

Q. Is it fair to say they developed a violent reputation?

A. Yes, sir.

Q. Did your investigation show, as we're about to talk about, that members did in fact commit multiple acts of violence?

A. Yes, sir.

Q. Okay. So turning back to Mr. Hinojosa, during your investigation you learned that he was a member of this Welcome to Hell Chapter?

A. Yes, sir.

Q. You said he was a probationary member, correct?

A. Yes, sir.

Q. Was he always in that status?

A. Well, when he first started hanging around -- and there's different ways to become a Bandidos. Mr. Hinojosa, to our investigation, was never a member of a support club. He was hanging around the Bandidos, which is kind of how they get to know you and know what you're about; and then they asked him to become a probationary member.

So when you start your participation in the Bandidos, you can either come in as a prospect or as a probationary member; and it's usually based off of your reputation, who you know, your knowledge of the motorcycle world, you know, if you can

ride, if they view you as tough, etcetera.
Q. As a probationary member, what's that say about his trajectory versus being a prospect?
A. It says that they knew him and trusted him and it -- you can say that a probationary track is probably more of a fast track. They're given a little bit more respect than the prospects are.
Q. Did he eventually complete his probationary --
A. Yes, sir.
Q. -- period?
And did he become a full member of the Bandidos Welcome to Hell Chapter?
A. A full member and then later the Sergeant-at-Arms of the Welcome to Hell Chapter.
Q. Okay. So we didn't talk about ranks and we don't need to go through the whole structure; but because Mr. Hinojosa was a Sergeant-at-Arms, what was the function of that rank and is the function of that rank in the Bandidos?
A. The Sergeant-at-Arms of a chapter, as much the Sergeant-at-Arms at the national level, are really in charge of the enforcement of internal rules and discipline and the protection and integrity of that chapter or of their national region. So it's enforcing club rules, the protection of the club and protection of its chapter president.
Q. And would that particular position have an important role

to play given the ongoing conflict with rivals such as B*EASTs and Homietos?
A. Very much so. The chapters' Sergeant-at-Arms are usually the ones that would be in charge of their internal security and then, you know, providing that security, what they call security against their rivals.
Q. Did the investigation reveal that Mr. Hinojosa has any aliases?
A. Yes, sir.
Q. And what's that?
A. He goes by -- sometimes, of course, they call him a "Darvi." In his phone, he'd be "D-Money"; but primarily it was "10 Round."
Q. "10 Round"?
A. Like the number "10" and then "Round," like a bullet. R-o-u-n-d.
Q. Okay. As in rounds of ammunition?
A. Yes, sir.
Q. Okay. So there's a lot to talk about. I'm going to try to compress this here.
Your investigation revealed that Mr. Hinojosa was involved in a number of acts of violence and criminal activity as part of the Bandidos criminal enterprise? Is --
A. Yes, sir.
Q. -- that fair to say?

Okay. Let's start with November 2, 2021, at the Blue Bayou Cafe here in the Houston area. Are you familiar with what happened there --

A. Yes, sir.

Q. -- on that?

Can you tell us about that?

A. Basically per the joint investigation members of B*EAST, one of the rivals or primary rivals of the Bandidos had held an event at their clubhouse in Channelview. After the meeting was over, many of the members left both in vehicles and on motorcycles and went to eat at the Blue Bayou Cafe.

When they left the Blue Bayou Cafe, after the B*EAST members and vehicles left, the three members on the motorcycles stayed and smoked cigarettes and looked like they were talking; and as they were leaving, a black SUV drove by and windows were down, gunfire emitted from inside the black SUV striking all three B*EAST members.

Q. And ultimately there was a death as a result of that, correct?

A. There was one dead B*EAST member and two wounded.

Q. We don't need to get into the entire investigation on that, but I'm aware that there is something regarding the defendant and his potential involvement revealed in your investigation. Is that right?

A. Yes, sir.

Q. Can you tell us about that?
A. We had received at -- submitted and obtained a cellular tower dump warrant out of the Southern District of Texas. Based off of many Bandidos numbers we'd had throughout our investigation, we had found the -- at the time the cell phone number of Darvi Hinojosa in the area of the shooting at the time of the shooting, that along with the arrested -- one -- arrested one suspect at the time. Looking at his phone records, him around Mr. Hinojosa had talked several times before the shooting. There was not communication during the shooting and then communication after the shooting.
Thirdly we did -- and then submitted and obtained out of the Southern District or it might have been Harris County, but for call detail records on that phone number of Mr. Hinojosa to see exactly where that phone was and it put it right with the other suspect right down the street of where the murder occurred.
Q. Okay. To be career here, that historical location information placed a phone associated with Mr. Hinojosa in the area of the murder at the time of the murder?
A. Yes, sir.
Q. Was he a member or associate of the Bandidos at that time?
A. At the time he was still the probationary member of the Welcome to Hell Chapter.
Q. Next we're going to go to another incident. We're going

to jump forward to June 3, 2023. This happened following a rival gang member leaving the Winters Bar in the Pasadena area. Are you familiar with this incident?
A. Yes, sir.
Q. What can you tell us about this incident specifically as it relates to Mr. Hinojosa?
A. From the joint investigation two B*EAST members had arrived to this Winters Bar to listen to some music and drink and there was a Bandito there who then called Mr. Hinojosa to report that B*EAST members were present at the bar and then he stayed there and he spoke various -- throughout various calls and text messages with Mr. Hinojosa throughout the night.
At the same time we discovered through phone records, various forms that we -- you know, either cell phone exams later on and then cell phone records, that Mr. Hinojosa in turn after the call letting him know the B*EAST members were there was in contact with two other Bandidos who then came, met up, they drove to the bar and then when the one B*EAST member left, those two members followed the B*EAST member, shot him seven times and then attempted to call Mr. Hinojosa afterwards.
Q. So in short you saw evidence -- gained evidence that was consistent with Mr. Hinojosa communicating and ordering this shooting of the a rival gang member?
A. Yes, sir.
Q. And you also spoke with a number of witnesses, including

confidential sources, regarding this attempted murder; is that right?
A. Yes, sir.
Q. It's fair to say that in those discussions they did indicate that Mr. Hinojosa ordered the attempted murder?
A. Yes, sir.
Q. Now, did the victim -- you said they sustained seven gunshot wounds?
A. Yes, sir.
Q. Did they live?
A. They did live.
Q. They were taken to the hospital and received extensive treatment there, correct?
A. Yes, sir.
Q. And you remember at the original detention hearing in this case there were photographs produced of the victim's injuries? Do you recall that?
A. Yes.
MR. BLACK: Your Honor, may I approach the witness?
THE COURT: You may.
**BY MR. BLACK:**
Q. So, TFO Lyons, I've handed you what has been marked and previously admitted in this case as Government Exhibits 2 and 3. Do you recognize those?
A. Yes, sir, I do.

Q. And are those photographs of the victim at the hospital who sustained the seven gunshot wounds?
A. Yes, sir.
Q. Your Honor, I have a packet here of those exhibits that I'm going to reference today along with this some new exhibits as well, and just for efficiency I tender those to the court at this time.
THE COURT: Okay. The other side has copies of them?
MR. BLACK: Counsel has a copy as well.
MR. FLOOD: I do, Your Honor.
**BY MR. BLACK:**
Q. I'm aware that additionally in the days following the shooting you obtained information from a credible confidential source indicating that Mr. Hinojosa made some statements or communications regarding what had transpired; is that right?
A. Yes, sir.
Q. Can you tell us about that?
A. The source reported that Mr. Hinojosa had showed a photograph of a gentleman in a hospital bed and made statements to the effect of "This is the guy from the other night."
Q. Okay. Indicating this is the one that there was the attempted --
A. That was shot seven times leaving the Winters Bar, yes, sir.
Q. Next we're going to go to February 23, 2023; so actually

we're going a little bit out of order here. My apologies.

In any event, on that date I'm aware that there was an assault and robbery of some rival gang members at a bar here in the Houston, Texas, area; is that right?

A. Yes, sir.

Q. That was the Bimbo's bar involving the Bandidos versus some rivals, correct?

A. Yes, sir.

Q. Can you tell us briefly what your investigation revealed about that?

A. There are several clubs that are considered friendly to the Bandidos. They're not support clubs; they're just considered friendly with them. They do a lot of events together, hang out, show respect, as they say it. One of those was the Gray Beards motorcycle club. However, throughout our investigation we discovered that the Gray Beards, like many clubs out there, were kind of torn in the middle in the war between the Bandidos and B*EASTs. So the Gray Beards had made a separate peace agreement with the B*EASTs, basically respect for respect, "We're going to leave each other alone" kind of thing.

Well, the Bandidos found out about that; and that wasn't tolerable to them. So they ordered the Gray Beards to this meeting and they confronted them during the meeting and --

Q. And this was at the Bimbo's bar?

A. At the Bimbo's bar, yes, sir. My apologies.
And there really wasn't much of a discussion. Once they were accused of what they were doing, a massive assault erupted and 14 members of the Gray Beards who were present were assaulted and their cuts were physically -- their vests were physically ripped from their bodies and stolen along with various personal items that were inside of their cuts -- wallets, keys, money, credit cards, etcetera.
Q. Now, did your investigation reveal anything regarding the defendant's participation in that assault and robbery?
A. Yes, sir.
Q. What was that?
A. He was there. We were able to obtain video, and we did some cellular tower dumps as well that put phone numbers in the area. Mr. Hinojosa was there. We -- we were able to see him on the video as well coming from the area of the assault and robbery.
Q. Additionally -- and we'll get to this later here -- at some point during your investigation you obtained a mobile phone possessed by Mr. Hinojosa; is that right?
A. Yes, sir. After his arrest on this -- on the state arrest for the narcotics, we were able to sees his cellular phone, get a search warrant for that device and examine it.
Q. During this examination -- and we'll talk about it more in a moment here -- it's my understanding you found something

relevant to the Bimbo's bar assault and robbery.

A. Yes, sir.

Q. What was that?

A. We found a photo of all 14 of the stolen Gray Beards' cuts laid out on the floor of a garage of a Bandidos member.

Q. Okay. So the cuts that were forcibly robbed from the Gray Beards, the defendant had a photograph of them?

A. Yes, sir.

Q. So during your investigation I'm also aware that you secured significant evidence regarding defendant's involvement in drug trafficking for the enterprise.

A. Yes, sir.

Q. So I guess -- just kind of generally can you tell us about what you learned in your investigation in that regard? And we'll talk about some controlled buys after that.

A. Yes, sir.

We had learned of several members of the Welcome to Hell Chapter that was involved in cocaine usage and cocaine trafficking. During a surveillance operation we were able to surveil a member of the Bandidos meet with Mr. Hinojosa in a front yard and obtain a bag that he was later pulled over with during a traffic stop that had some prescription pills of Mr. Hinojosa in the bag, as well as cocaine.

Q. That was seized as evidence, correct?

A. Yes, sir.

Q. And based upon the surveillance and the fact that Mr. Hinojosa's prescription was found in there, do you believe that cocaine to be from Mr. Hinojosa?
A. Yes, sir.
Q. Following that, were controlled purchases ultimately conducted from Mr. Hinojosa?
A. Yes, sir, two.
Q. Okay. And let's just start with I'm aware that on October --
THE COURT: Is there any controversy about whether these drug purchases were made?
MR. BLACK: No, Your Honor.
THE COURT: Let's skip that.
MR. BLACK: Okay.
**BY MR. BLACK:**
Q. So it is fair to say you did controlled purchases twice from Mr. Hinojosa during this case?
A. Yes, sir.
Q. So following that I'm aware that you reviewed the contents of the defendant's phone pursuant be to a warrant. Is that correct?
A. Yes, sir.
Q. And was there evidence of drug trafficking on that device?
A. Yes, sir, several -- probably two to three years' worth of messages regarding cocaine trafficking.

Q. And were there also various images relating to the Bandidos and drug trafficking?
A. Yes, sir.
Q. And also an apparent ledger, correct?
A. Yes, sir.
MR. BLACK: Your Honor, may I approach the witness?
THE COURT: You may. How much more do you have, sir?
MR. BLACK: Probably about 10 more minutes, 10 to 15.
**BY MR. BLACK:**
Q. So, TFO, I've given you what have been marked as Government's Exhibits 200 through 206. Do you recognize those items?
A. Yes, sir.
Q. Are those items found on Mr. Hinojosa's phone?
A. Yes, sir, they appear to be.
Q. Okay. Let's start with 200. Is that a picture of Mr. Hinojosa?
A. Yes, sir, in his Bandidos cut showing his rank and his membership and his Expect No Mercy patch.
Q. So his rank at the time -- what was displayed for his rank?
A. In this photo Sergeant-at-Arms and he was the Sergeant-at-Arms when we arrested him.
Q. You mentioned the Expect No Mercy patch. Is that significant to you?

A. Yes, sir, it is.
Q. Why is that?
A. Not every Bandidos member has it. It's a rewarded patch, and basically you have to be nominated for it by your chapter president for a significant act of violence committed in the name of the Bandidos enterprise.
Q. So the fact that Mr. Hinojosa is displaying that on his cut indicates to you that he was rewarded that for an act of violence?
A. Yes, sir.
Q. Exhibit 201 is that just another picture of Mr. Hinojosa in his cut?
A. Yes, sir. And you could see that in the Exhibit 20 as well, the Expect No Mercy. Once you have the patch, you can wear it as he is on a medallion.
Q. Understood.
Exhibit 202, what's that?
A. That's all the members of the Welcome to Hell Chapter of the Bandidos.
Q. Is Mr. Hinojosa depicted on there?
A. Yes, sir, on the far left.
Q. Exhibit 203?
A. Yes, sir. You need me to describe it?
Q. Yeah. What is it?
A. It's just a bottle of Super Inositol dietary supplement

that, through our training and experience, is commonly used as a cutting agent for cocaine and drug trafficking.
Q. Understood.
Go to 4, I think we're on, if I'm right.
A. Yes, sir. A photograph of what appears to be a green leafy substance reassembling marijuana.
Q. And the next exhibit, 205?
A. It appears to be a AK or SKS variant assault rifle, a photo of it.
Q. Okay. And then finally 206. This will require, I think, a little more explanation. What are we seeing there?
A. That appears to us in his notes tab of his cell phone to be a drug ledger based off the numbers and the additions and subtractions to it. It's common and we find these in many cell phones throughout -- at least I have through my gang investigations where drug dealers, instead of keeping paper ledgers, which are more easily discovered on search warrants and by law enforcement, they could keep them in their phone and it's more readily accessible, as well, that they can keep track of how much they sold, who owes them money, if they sold it on the front and etcetera.
Q. That's based upon your training and experience?
A. Yes, sir.
MR. BLACK: Government formally offers Exhibits 200 to 206.

MR. FLOOD: No objection, Your Honor.
MR. BLACK: Admitted, Your Honor?
THE COURT: Admitted without objection.
MR. BLACK: Thank you, Your Honor.

**BY MR. BLACK:**

Q. Okay. So let's move forward to -- I'm aware that actually on April I think it was 18th of '24 the defendant, Mr. Hinojosa, was arrested by the state for a drug offense. Is that correct?
A. Yes, sir.
Q. He was released on bond; is that correct?
A. Yes, sir, I believe so.
Q. Then on April -- I think it was April 29th, 2024 -- does that sound right -- he was arrested in this case, correct?
A. I think it was later in the year.
Q. October. I apologize.
A. October, yes, sir.
Q. I apologize. October 29th or '24 he was arrested --
A. Yes, sir.
Q. -- in this case, correct?
And his residence was also searched --
A. Yes, sir.
Q. -- correct?
Can you walk us through his arrest and the search of his residence?

A. Located him there, arrested him for the federal warrant, engaged in a search warrant execution, found numerous items of Bandidos membership paraphernalia, found some narcotics paraphernalia in his room as well as in his father's room some cocaine and baggies and scales.
Q. Now, the Bandidos paraphernalia -- was the fact that you discovered that in his residence still significant to you?
A. Yes, sir.
Q. Why is that?
A. Well, it still showed his membership in the organization and his rank and his status as a member of the SS group. You know, once you're not in the Bandidos anymore, they will physically come and remove all of your items in your house; and you are not allowed to have anything that says you're a Bandito anymore.
THE COURT: Mr. Black, I think I've heard enough. I'd like to give the defendant a chance at cross-examination. I'm going to ask you to bring your interrogation to a close.
MR. BLACK: Certainly if the Court is inclined to grant bond, the government would ask to finish its record, but I can conclude for now.
THE COURT: I think we're good for now. Thank you.
MR. FLOOD: Thank you, Your Honor.
THE COURT: Do you need a break, sir?
THE WITNESS: No, sir. I'm okay, sir. Thank you.

**CROSS-EXAMINATION**

**BY MR. FLOOD:**

Q. Agent Lyons, you described three different events. I think in the defense of this case we can call them Blue Bayou, Winters and Bimbo's. Are those the three --

A. Yes, sir.

Q. And you described in depth his -- Mr. Hinojosa's potential involvement in those; but you're aware that Mr. Hinojosa is not charged with anything related to Blue Bayou or anything related to Bimbo's, correct?

A. I'm not -- I don't know if I can say that, sir. I haven't -- I don't have the indictment in front of me to just know specifically what counts he's been --

THE COURT: Is that disputed, Mr. Black?

MR. BLACK: So he's not charged with any substantive count. It's part of the overall racketeering --

THE COURT: Okay.

MR. BLACK: -- activity, but no --

THE COURT: All right. I'll assume that's true, then.

MR. FLOOD: Thank you, Your Honor.

**BY MR. FLOOD:**

Q. Are you the case agent?

A. I'm one of them, yes, sir.

Q. Okay. And so if you -- how long have you been investigating the Welcome to Hell Chapter?

A. The Welcome to Hell Chapter formed in approximately October 2021, so since then.
Q. And so you essentially saw it form and watched this occur?
A. Watched its growth, yes, sir.
Q. And the Welcome to Hell Chapter was formed because there was a turf war, for lack of a better word, right?
A. Yes, sir.
Q. With the B*EASTs?
A. And other clubs, yes, sir.
Q. And another club?
A. Yes, sir.
Q. And this -- well, this chapter was cobbled together with either people who were brand new to the Bandidos like Mr. Hinojosa or others who had a longer history like Mr. Pfeffer, who became president of the Welcome to Hell Chapter, right?
A. Mr. Pfeffer was part of recruiting who he wanted in, specifically who he knew.
Q. And Pfeffer, for the record, is incarcerated, correct?
A. Yes, sir.
Q. Is that Welcome to Hell Chapter over? Is it gone?
A. No, sir, it's still there.
Q. You've said -- and I'll start at the end and then go backwards. You said it's possible to not become a member of the Bandidos. How does one formally leave the Bandidos?

A. You can -- there are several ways. You can -- they actually do have medical requirement. They do have other retirement, you know, just based off your years of service with them, like upwards to 40 or 50. Short of that, if you leave on your own you are put out in what they call 86 or bad status, no contact, no association and then that's when they come and take all of your stuff, potentially your motorcycle as well.
Q. And that is something that happens within the Bandidos? People can voluntarily leave?
A. They can put in for it, yes, sir.
Q. Okay. So if Mr. Hinojosa wanted to put in for leaving the Bandidos, that's possible?
A. Yes, sir.
Q. Now in terms of the Winters Bar -- well, first off, let's talk about this drug dealing real quick. This ledger you've introduced as Exhibit 206, this is dated October 15th, 2022. If I showed you that, would you have any reason to dispute that?
A. I wouldn't dispute it if that's what it says, sir.
Q. And that's well before he's charged in state court and obviously well before he's charged in this case, correct?
A. I've -- if it's 2022 and he wasn't arrested until 2024, then I would assume that's correct.
Q. So in terms of evidence that he was violating bond, that is evidence -- is not evidence that he was somehow violating

bond; is that correct?
A. The drug ledger itself, no, sir.
Q. Now, Winters Bar you obtained what's called a "cell tower dump," right?
A. Yes, sir.
Q. What that is is you subpoena from the cellular company all the phones in an area, correct?
A. Yes, sir. You basically give them the coordinates or the location of where a crime occurred, for example; and then it pulls the numbers that are active in hitting off the tower that needs that coordinates or area.
Q. So you request all devices that connect to that tower, correct?
A. From the major networks, yes, sir.
Q. And so it's not tied to an individual; it's tied to an area?
A. It's our job once -- so when the records are returned, they're just numbers; and you either know the number or you don't, because we had, throughout our investigation of the Bandidos, compiled numerous Bandidos' numbers to different Bandidos members. We knew based off of if we recognized it or we looked at what numbers that we already had on record, and that's how we identified Mr. Hinojosa.
Q. So you had the phone numbers of the alleged individuals before you asked for these cell tower dumps?

A. We had -- we had numerous Bandidos phone numbers to our investigation.

Q. So it would have been possible to ask for less information, meaning you could have asked for records regarding each of these individual phone calls and not all individuals within that area?

MR. BLACK: And, Your Honor, I think we're outside of the scope of direct and the scope of this hearing at this point.

THE COURT: Say it again.

MR. BLACK: I think we're outside the scope of direct and this hearing at this point. We're engaged in search-and-seizure questioning.

THE COURT: Well, the rules of evidence don't apply to these kinds of hearings. I'm going to allow some latitude.

**BY MR. FLOOD:**

Q. So the evidence regarding Winters Bar & Grill is that Mr. Hinojosa was not there, correct?

A. He was not there, no, sir.

Q. And you have some evidence from cooperating individuals suggesting that he told them to go do this bad act, correct?

A. That, and phone records with those -- with the shooter.

Q. So you -- you can see a phone call occur based on this -- the cell tower dumps and other subpoenas; and you have talked to an individual who says, "Here's what occurred on that phone

call," correct?

A. Yes, sir.

Q. But when you seized Mr. Hinojosa's phone and saw his text messages, there was no text messages saying," carry out this crime," correct?

A. There weren't the text messages, but there was the communication with those people that was still on his phone and specifically a message that Hinojosa sent to the driver that he could leave his Jeep and the other Bandidos member would take the Jeep home because the driver drove the shooter and Mr. Hinojosa was in contact with him.

Q. And that text message doesn't say anything about shooting anyone, correct?

A. The word "shoot" is not in the text message.

Q. The word "kill" is not in the text message?

A. The word "kill" is not, no, sir.

Q. The word "hit" is not in the test message?

A. No, sir.

Q. All that text message says is "You can leave your car there"?

A. His Jeep, yes.

Q. Jeep, vehicle.

Okay. So what we have in terms of evidence of violence either perpetrated by or suggested by Mr. Hinojosa is the testimony or the statements of members of the Bandidos or

wannabe members of the Bandidos after they were arrested, correct?

A. Arrested on what charges?

Q. Or after they were approached by law enforcement --

MR. BLACK: Your Honor, we're getting into areas of confidential sources at this time. I think the question can be rephrased.

MR. FLOOD: I'll rephrase the question.

**BY MR. FLOOD:**

Q. The individuals who've identified -- who've said they were on the phone call with Mr. Hinojosa when he said these things, which you can't -- we don't have any written evidence of or physical evidence of, these individuals were also engaged in or members of a motorcycle gang, correct?

A. Yes. They were Bandidos. Yes, sir.

Q. And so they have made this statement without any evidence to support it, correct, other than the fact that a phone call existed?

A. I wouldn't agree that there's not evidence to support it.

Q. Well, what evidence is there to support it?

A. It's probably in the discovery y'all have, sir. I...

Q. Well, we don't know what was said on that phone call, correct?

A. No, sir. No. Yeah, it was not monitored. It wasn't recorded.

Q. And there's no text message saying -- you know, that corroborates what these two individuals have told you, correct?
A. There's no text message, no, sir.
Q. Now, you are a co-case-agent on this case; and you know that there are four other members of the Bandidos organization who are on bond in this case, correct?
A. Don't marry me to a number, sir. I know there are a few.
Q. Brandon Hantz is on bond?
A. Yes, sir.
Q. Marcel Lett is on bond?
A. Yes, sir.
Q. Sean Christison on bond?
A. Yes, sir.
Q. And Michael Dunphy is on bond?
A. Yes, sir.
Q. Are we able to sufficiently monitor that they're not engaging in any other activities with Bandidos since they're on bond?
A. That they're not?
Q. Yes, sir.
A. It's very difficult if someone's not incarcerated because, just like we saw in this case with Mr. Hinojosa, all you need to call shots in the Bandidos is a cell phone.
Q. But we've not seen any activity. There's been no motions filed or no one said, "Oh, my gosh. These guys continue to

engage in Bandidos activities," right?
A. We don't have the probable cause to monitor their cell phone devices at this time.
Q. Do you have any reason to believe those individuals are engaged in Bandidos activities while on bond?
A. Those that have officially left the Bandidos, no, sir.
Q. So that's a good point. You can be released on bond and quit the Bandidos?
A. You could try, yes, sir.
Q. And the evidence that Mr. Hinojosa is a danger to, anyone from the indictment and from the testimony, is based on the two people who say, "Here's what he said on the phone"?
A. I think there's more than that.
Q. What else?
A. There's more than two people.
Q. Oh. That he's on the phone with?
A. No, sir. You didn't say the phone, just that he was a danger.
Q. Oh, no, no. I was saying the danger regarding what occurred at Winters Bar & Grill is that Mr. Hinojosa was on the phone with somebody and told them to commit a crime, correct?
A. That's some of it, yes, sir.
Q. Okay. And the other two -- well, I don't need to go there. The other two he's not charged with in the indictment. We've seen that, correct?

A. Whatever was ruled, sir.
Q. And in terms of the Winters Bar & Grill -- I'm looking at your former Exhibit 4, which was a timeline y'all put together for the previous hearing -- the phone calls regarding Winters Bar & Grill start at, like, 10:20 p.m., correct?
A. I believe so, sir. I don't have it in front of me.
Q. And the shooting is three hours later; is that fair?
A. I think so, sir, again, without looking at it.
Q. Would it have been any problem at all for Mr. Hinojosa to go to Winters Bar & Grill?
A. He knew he didn't need to.
Q. But he certainly could've, correct? He had a three-hour window to go do this crime that you said was so pending?
A. Sergeants-at-Arms aren't going to go do that.
Q. That's what a Sergeant-at-Arms does, correct?
A. No.
Q. Well, they have arms, correct? A Sergeant-at-Arms is someone who is in charge of the weapons, correct?
A. No, sir.
Q. Okay. Anyway, you said he's an enforcer?
A. He's part of the SS crew, which is a violent hit squad.
Q. And he had all the time in the world to drive across town and go to Winters Bar & Grill?
A. He could have, I suppose.
Q. But the evidence is from the two other Bandidos that he

told them to do it over the phone?
A. Yes, sir.
Q. Just in terms of the Bandidos and these jackets and cuts and everything, this is an open, notorious membership, right? You drive around on your motorcycle with your signs on it, right? Nobody is hiding the fact that they're a member of this club, right?
A. They will hide it sometimes. Sometimes they don't.
Q. Well, it's fairly open and notorious, correct?
A. When they're wearing their cuts, they're pretty open. When they're not, then they're not, if that makes sense.
Q. Yeah, I get it. You can't --
A. And sometimes that's how they commit their crimes, in vehicles without wearing cuts, which is what happened at Winters.
Q. Now, you indicated earlier that when you arrested or when Mr. Hinojosa was arrested at his home that it was his father. Do you know that that was his father who was there, or could that be a different relation?
A. I believe it -- at least that's what we were told was his father. I'm not sure if it's a stepfather or a father figure. I don't remember his name off the top of my head.
Q. Okay. Would it surprise you to learn that was not his father?
A. I'm not sure if I'd say, "surprised." I would need to

look at the identity.
Q. If I suggested to you that was not his father, would you have any reason to dispute that?
A. If you've proven that it's not, then I'll believe you, sir.
MR. FLOOD: One second.
**BY MR. FLOOD:**
Q. And again, you've previously testified in this matter regarding his bond, correct?
A. Yes, sir.
Q. And at that hearing you stated confidently that a substance found in Mr. Hinojosa's bedroom was cocaine, correct?
A. We said that -- from what I recall that it appeared to be cocaine; but you know, of course, we always send our stuff to the lab.
Q. You were incorrect? It was not cocaine?
A. It was not.
Q. It was lidocaine powder, correct?
A. Lidocaine powder, yes.
Q. And at the previous hearing, in fact, his previous counsel said it was lidocaine powder?
A. I don't remember if lidocaine was in the transcript, if they said it was lidocaine or not. My apologies, sir. I don't know.
MR. FLOOD: That's all I have, Your Honor.

THE COURT: Okay.

Any closing argument? I'm ready to rule.

MR. FLOOD: Your Honor, I think for the record I need to make a proffer on Mr. Hinojosa's behalf.

THE COURT: Okay.

MR. FLOOD: I would stand by the proffer made at the magistrate's court. I would add to that that the individual who previously lived with Mr. Hinojosa's mother, incorrectly identified as Mr. Hinojosa's father, no longer lives at that home, Judge.

He would be living -- if released, he would live with his mother, Diana Lopez, and his common-law wife, Jennifer Hernandez. They have a one-year-old son -- daughter, I apologize -- a one year-old daughter. Mr. Hinojosa has never lived with his daughter, Judge, because she was born subsequent to his arrest; and he would return home and would gain rightful employment, would immediately withdraw from the Bandidos, as we've heard is possible, Judge.

THE COURT: So his mother and his partner live together?

MR. FLOOD: Yes, Your Honor.

THE COURT: Okay.

MR. FLOOD: I would also proffer he has a long work history. He has two children from his prior marriage, an 8-year-old and a 14-year-old; and he supports and helped

support them prior to his arrest, Your Honor.

THE COURT: Thank you very much.

MR. FLOOD: Thank you, Judge.

THE COURT: Mr. Black?

MR. BLACK: Your Honor, I know the Court has read our written submission; but just to, I guess, reemphasize where we're at, this is someone who is still a member of the Bandidos, a Sergeant-at-Arms in the Bandidos. The Court heard testimony both now and previously at Magistrate Judge Ho that he was involved in or is a suspect in a shooting back in 2021. He's charged with ordering the attempted murder in 2023 outside of Blue Bayou -- excuse me -- at Winters. He's a suspect and was present at the assault and robbery at Bimbo's in 2023. You've heard evidence -- and the previous court did -- regarding his drug trafficking and then also what was discovered in his residence when he was arrested.

All of this led Judge Ho to reasonably conclude that there are not conditions that she could fashion to reasonably assure community safety and that he should be detained pending trial.

The only thing that has changed is a little bit of cocaine turned out to be lidocaine. That's it. All the evidence regarding violence, which was at the heart of the Court's concern, remains the same.

THE COURT: Do you want to say anything further?

MR. FLOOD: Your Honor, I think you understand the gist of my argument. The argument is he's not a danger, Your Honor. If he withdraws from this organization and he doesn't have anything to do with these people, the only evidence of danger was that he was on a phone call. There's nothing to support these two individuals' uncorroborated testimony about what he said on that phone call. There's no evidence that he's a flight risk. There's no evidence he's an ongoing danger, Your Honor. I think there are conditions that this Court could set that would keep him -- you know, I don't think that they've carried the burden regarding clear and convincing evidence that he's an ongoing threat or a flight risk, Your Honor.

THE COURT: I congratulate both advocates on their presentations. I've learned from both of you, and it's been very helpful.

I understand the default on the alleged cocaine. I understand that there is no crystal ball that allows me to peer into the future; but based on what's happened in the past, based on what's been established in this case, I'm not able to second-guess Judge Ho. I think the detention is appropriate, and I am not going to disturb it.

Thank you very much.

MR. BLACK: Thank you.

MR. FLOOD: Thank you, Your Honor.

(The proceedings were adjourned.)

* * * * *

COURT REPORTER'S CERTIFICATE

I, David S. Smith, CSR, RPR, CRR, Official Court Reporter, United States District Court, Southern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

/s/ David S. Smith
Official Court Reporter